Russell LITHERLAND,
Plaintiff-Appellant,

v.

PETROLANE OFFSHORE CONSTRUCTION SERVICES, INC., et al.,
Defendants-Appellees.

No. 75–2722.

United States Court of Appeals,
Fifth Circuit.

Jan. 28, 1977.

Rehearing Denied March 8, 1977.

---

**11.** See n. 4, *supra.*

William D. Hunter, Morgan City, La., for plaintiff-appellant.

Christopher Tompkins, New Orleans, La., for Petrolane Offshore and others.

W. K. Christovich, New Orleans, La., for Petrolane only.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This suit for Jones Act negligence, unseaworthiness and maintenance and cure was brought for the injuries suffered by an offshore diver. Russell Litherland sued Petrolane Offshore Construction Services, Inc. (Petrolane) and Insurance Company of North America *in personam*, and libelled Petrolane's barge ALLIGATOR *in rem*. The jury found negligence and unseaworthiness but failed to find causation under either theory. It then awarded $75,000 maintenance and cure. Appellant Litherland levels a double-barreled attack upon the verdict and judgment: alleged plain error in the causation instructions, and abuse of discretion in denying a motion for new trial based upon the absence of evidence to support the verdict. We AFFIRM.

The facts surrounding this incident demonstrate why seamen are the wards of the courts. The sailor's life is usually neither exhilarating nor salutary; frequently it is grim and dangerous.[1] Therefore, we have examined the conduct of this trial and the findings of the jury and render our opinion in detail.

Russell Litherland, a thirty-four year old diver with nine years' experience in offshore diving, was sent to work on the floor of the Gulf of Mexico at three o'clock in the morning on November 19, 1973. His task was to descend 240 feet to unhook a device called a "Gator" from a pipeline which defendant-appellee Petrolane had installed for Standard Oil· Company of New Jersey. The pipeline had an overbend which Petrolane had to remove. Having decided to abandon the pipeline-burying business, Petrolane had sold its equipment which was scheduled for delivery December 1, 1973. This was its last job, and appellant's assignment was the last dive.

The Gator is a patented[2] contraption of tubular metal which straddles a pipeline

1. Defense counsel and Bill Nicholson, the Petrolane supervisor on the barge, had the following exchange:

Q. Mr. Hunter just made the remark that you don't know anything about diving; is that correct, sir?

A. I know enough not to do it, sir.

2. U. S. Patent No. 3,576,111 issued April 27, 1971.

and uses jets of water to blast a ditch out of the ocean floor. The pipeline settles into the newly created trench. Other jets of water propel the Gator along the pipeline. The spoil banks eventually settle back into the trench, securing the pipeline from anchors and fishing nets. The Gator is aptly named because it resembles a schematic diagram of the reptile with apertures from which the water surges. Attached to this Gator was a water hose to the surface. It was supported at fifty foot intervals by five 55 gallon oil drums filled with air. The lowest drum was only twenty-five feet above the Gator. The Gator itself was equipped with three 55 gallon drums for air barrels. Each drum was cut out at one end and could be filled by bubbles exhaled by the diver. The purpose of the barrels was to supply sufficient buoyancy to enable divers to maneuver the Gator when necessary. Earlier models had two closed pontoons which were filled from hoses. Most, if not all, other companies used closed tanks of some sort.

Until the day before the accident only two barrels were attached to the Gator; each was suspended by a chain at the end of an outrigger. Because the Gator was digging a trench deeper than usual, the outriggers were dragging in the spoil banks thrown up by the Gator. Diver Jerry Ard was sent to modify the Gator by attaching a barrel in the middle of the machine and removing the outriggers with their two barrels. He attached the center barrel but could not cut off the outriggers. A Petrolane supervisor at the surface told him to "forget it" and the Gator was left with three barrels instead of one or two. The Gator weighed about seven hundred pounds and each barrel when full of air could lift about four hundred pounds at that depth.

It was not inconceivable that three barrels with a substantial amount of air inside could cause the Gator to rise precipitously.

Working entirely by feel around a device he had never handled before, appellant unhooked the "V roller" connecting the Gator to the pipeline. The Gator was raised out of the ditch by a crane at the surface and appellant reported to the surface operator that he felt a bit nauseous (a not infrequent occurrence for that depth). He was told to change his helium-oxygen mixture from "demand" (which requires the diver to suck in air when desired) to "free flow." Suddenly appellant ascended from 240 feet to about 40 feet, saying "It's got me" or "It got me" three times. Rapid decompression caused the "bends." The quick action of the surface crew in placing appellant in a recompression chamber saved his life but failed to avert grievous personal injuries. His I.Q., which was about average and reflected his attendance at college for over a year, has dropped to about 81, or a dull normal. His mental impairment is accompanied by loss of potency and bowel control, as well as phlebitis.

## CAUSATION: THE COURT'S CHARGE

■ Appellant concedes that the instructions were technically correct, but argues that the trial judge confused the jury by juxtaposition of the different types of causation appropriate to the negligence and unseaworthiness counts.[3] Relevant excerpts of the instructions refute this contention. The trial judge charged the jury:

> To recover for negligence under the Jones Act, the plaintiff must prove that his employer was negligent and that that negligence played some part, no matter how slight, in actually bringing about or causing the injuries sustained.

**3.** At oral argument appellant buttressed his claim that the jury was led astray by noting that the $75,000 maintenance and cure award was out of proportion to the circumstances of the case, as well as being more than he had asked for. He reasoned that the jury sought to adjust what it perceived as an unjust result. Appellees were put in the position of supporting the reasonableness of the maintenance and cure award at oral argument. In his brief, appellant's counsel sought to save the maintenance and cure award for his client in the event of a reversal on the other issues. He argued that maintenance and cure issues were distinct and severable and should therefore be upheld. In light of our disposition of the case and appellees' failure to appeal the award of maintenance and cure, it is unnecessary to consider it further.

Now, the plaintiff also contends that the vessel was unseaworthy.

\* \* \* \* \* \*

To be in a "seaworthy" condition means to be in a condition reasonably suitable and fit to be used for the purpose or use for which provided or intended.

\* \* \* \* \* \*

Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. That is to say, the shipowner or vessel owner is liable for all injuries and consequent damage proximately caused by an unseaworthy condition existing at any time, even though the owner may have exercised due care under the circumstances, and may have had no notice or knowledge of the unseaworthy condition which proximately caused the injury or damage.

Now, defective equipment or unsafe conditions aboard the vessel may render the vessel unseaworthy.

In order for a vessel to be found unseaworthy, the defective condition need not be of the type as to render the entire vessel unfit for the purposes for which she was intended. If defective equipment or unsafe condition of the ship or vessel proximately causes the individual's particular injury, then the ship or vessel is unseaworthy as to that individual.

\* \* \* \* \* \*

Now, to recover for unseaworthiness, the plaintiff must prove not only that he was injured on an unseaworthy vessel, but that his injury was a proximate result of the unseaworthiness.

Proximate cause largely depends upon the circumstances of each case.

An injury is proximately caused by an act, or failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury; and that the injury was either a direct result or a reasonably probable consequence of the act or omission.

This does not mean that the law recognizes only one proximate cause of an injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things, or the conduct of two or more persons, may operate at the same time, either independently or together, to cause injury; and in such a case, each may be a proximate cause.

Now just to summarize this briefly, with respect to the negligence charge, that's the charge brought under the Jones Act. The plaintiff has the burden of establishing by a preponderance of the evidence, negligence on the part of his employer or one for whom the employer is responsible. He must establish that the negligence played some part, no matter how slight, in actually bringing about or causing the injury that he sustained.

Now, with respect to the unseaworthiness claim, in order for the plaintiff to recover on that basis, it is incumbent upon him to establish by a preponderance of the evidence that the vessel was unseaworthy and that unseaworthiness was a proximate cause of his injury.

These instructions are neither objectionable nor confusing. *See Spinks v. Chevron Oil Co.*, 507 F.2d 216 (5th Cir. 1975). The term "proximate cause" was never mentioned in connection with the Jones Act claim. The jury should not have been confused by this instruction. As a further safeguard the trial judge submitted the case on special interrogatories under F.R. Civ.P. 49(a):

3. Was defendant, Petrolane, negligent?

Answer that yes or no. If your answer is yes, answer 4. If your answer is no, answer 5.

4. Did this negligence play any part, no matter how slight, in producing plaintiff's injuries?

Answer that yes or no. And then answer 5.

5. Was the barge ALLIGATOR unseaworthy?

Answer that yes or no. If your answer to 5 is yes, answer 6. If your answer to 5 is no, but your answer to 4 was yes,

answer Number 7. Just read them carefully, and you can't go wrong.

6. If so, was this unseaworthiness the proximate cause of plaintiff's injuries?

■ This submission rigorously insulated the causes of action from each other. We find no plain error present.[4]

## DENIAL OF THE MOTION FOR NEW TRIAL: SUPPORTIVE EVIDENCE

Appellant's argument here is plausible but, on careful review of the record, unpersuasive. The wrangle over the cause of the ascent focused upon two major scenarios. Appellant argued that the open-ended barrels filled up with bubbles exhaled as he worked around the Gator, causing it to rise and drag him along since he was on the machine or his air hose was entangled in it. Appellees contended that the Gator never rose; rather, appellant's wet suit "blew up" with air and caused his ascent. A "big fish" theory was mentioned by some witnesses, but apparently discounted by all parties as a red herring sans moonlight. Appellant's cryptic message from below was sufficiently ambiguous so as to deny conclusive support for either theory.

Appellant's only direct evidence that the Gator rose 200 feet on this occasion came from appellant himself, who testified that he saw the Gator at 40 feet. Despite the darkness of the hour, this would not have been impossible since the barge was flood-lit. Given the inferior vantage point of the persons on the barge, it is not surprising that none of them saw the Gator.

One further piece of testimony developed during appellant's case in chief actually helped the defense, but was brought out by appellant to minimize its impact. Dr. Irving Fosberg, a clinical psychologist who saw appellant three months after the accident, testified to having heard a different story from appellant:

Q. Doctor, again in answering the question, and type of pre-history that you're provided, why do you take it?

A. In answer to why I take it, there are two reasons: First, to get some basic raw information; secondly, to give the client an opportunity to get used to me, my voice, the room and the total situation, so as to maximize the reliability of the test results when they are administered. As to what I did find out from Mr. Litherland at that time, it was that he was a diver and that he had an accident in November of 1973 in which he states that while working in about 250 feet of water something went wrong to his airsuit. It filled out and he rose to the surface too quickly and passed out in a decompression chamber.

Q. Okay, where did this business about the airsuit come from?

A. From the patient.

Q. Did you also have his wife there?

A. She was not in the room at that time that I talked to him.

Q. Was he communicating well?

A. No, sir. I indicated in my report that he was not a very good source of communication. He didn't seem to catch on. He was sometimes a little bit beside the point, and I had difficulty in really coming to grips with the information he was trying to convey.

Appellees' evidence was not strong. The defense attempted to establish on cross-examination of appellant's witnesses that a wet suit could blow up. This theory was consistently rebuffed by witnesses with diving experience. However, appellant did wear the flap from his helmet inside his wet suit, making egress of exhaled air more difficult. Two divers testified that any air in a wet suit would speedily exit through the sleeve. However, appellant was wearing gloves. Whether they overlapped the

---

4. Appellant is relegated to a "plain error" attack because his proposed instruction No. 4 was not entirely correct. Part of that instruction read as follows:

Under the Jones Act if the employer committed some act or omission that played any part, no matter how small, in actually bringing about or causing injury to Russell Litherland, then you should find that the employer was negligent.

cuff of the suit was not developed. The defense attempt on cross-examination to show that bubbles could accumulate in the top of the mask and helmet in sufficient volume to lift appellant was similarly denied. The defense read into evidence part of the deposition of Donald Nick Weber, assistant diving supervisor on the barge, regarding an accident report he authored soon after the accident:

Q. Do you know whether—did the information that went on that accident report, did that come from you or come from the person that you had told to call the office, or just how did they make that up?

A. Well, there was information on it from me, and there was information on it from the doctor, and I believe there was information on it from everybody that was involved at the time.

Q. Well, did you list the cause of the accident?

A. Yes, it was listed as a blowup. The diver—a rapid ascent was what it was listed as.

Q. What I'm asking you, sir, is do you know what caused the rapid ascent?

A. No, I don't.

Doctor Fosberg's testimony points up another problem at the trial. Appellant apparently had some difficulty communicating. The trial judge observed outside the hearing of the jury that the appellant was "obviously mentally deficient" and therefore allowed appellant's attorney to ask leading questions of his client under Fed.R. Evid. 611(c). Appellant was also very upset as he recounted the incident and at one point broke down on the stand.

The jury heard this testimony along with evidence as to appellant's injuries and refused to find even slight causation for negligence or proximate causation for unseaworthiness.

■ As a reviewing court, we can neither look into the faces of the witnesses nor hear

them speak. Juries do not labor under that disability and the appellate courts defer to their judgment.[5] *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir. 1969). We are aware that "the fundamental rule which makes the jury the sole judge of the weight and credibility of testimony is subject to the caveat that testimony concerning a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached, are in no way discredited by cross-examination, must be taken as true." *Holland v. Allied Structural Steel Co.*, 539 F.2d 476, 483 (5th Cir. 1976), quoting *Chicago, R. I. & P. Ry. Co. v. Howell*, 401 F.2d 752, 754 (10th Cir. 1968). Unfortunately, appellant's version at trial was not bathed in clear light.

Appellant's burden of persuasion on causation is very light, *Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142, rehearing den., 517 F.2d 675 (5th Cir. 1975), but it does exist. Otherwise it would be an exercise in futility to request the jury to determine causation. Here the jury found that appellant did not meet his burden. We cannot say that reasonable men could not reach this verdict. Conversely, had the jury found either or both of the causation issues favorable to appellant, we would also have affirmed on the basis of this record. The jury had ample warrant for finding either way; it was not compelled to find the issues one way.

■ The subsequent decision of the trial judge to deny the motion for new trial is reviewable for an abuse of discretion. *Vidrine v. Kansas City Southern Ry. Co.*, 466 F.2d 1217 (5th Cir. 1972). Normally, denial of the motion will be reversed only when there is an absolute absence of evidence to support the verdict, this court being reluctant to reverse when the verdict is merely against the great weight of the evidence. *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th 1973). Without deciding the question of which standard is appropriate, we find that the verdict was not against the great weight of the evidence,

---

5. Although the Seventh Amendment does not require a jury trial in admiralty cases, *Fitzgerald v. United States Lines*, 374 U.S. 16, 20, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963), we accord the jury's verdict the traditional respect given to the finder of facts.

let alone unsupported by evidence. We agree with the jury and the trial judge that appellant established a prima facie case but not an airtight one.

AFFIRMED.