**Michael W. KRATZER**

v.

**CAPITAL MARINE SUPPLY, INC.**

Civ. A. No. 78–329–B.

United States District Court,
M. D. Louisiana.

May 13, 1980.

H. Alva Brumfield, III, Brumfield & Brumfield, Baton Rouge, La., for plaintiff.

James H. Daigle, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

Plaintiff, Michael W. Kratzer, brings this action for negligence under the Jones Act, 46 U.S.C. § 688, for unseaworthiness under general maritime law and for maintenance and cure. Trial was held before the Court without a jury. After considering the evidence adduced at trial and the briefs filed by counsel, the Court hereby enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On the date of the accident, plaintiff Kratzer was employed by defendant, Capital Marine Supply, Inc. ("Capital Marine"), as a tankerman and a member of the crew of the M/V BAYOU LAFITTE, a pushboat, and its midstream refueling barge, the CHOTIN 1200. Both vessels were owned and operated by Capital Marine and were based at its offices and boat store located on the east bank of the Mississippi River at the foot of North Street in Baton Rouge, Louisiana.

2. On January 5, 1977, Kratzer was working the night shift as tankerman in charge of the fueling operations of the barge CHOTIN 1200, a fuel flat used to provide midstream refueling services to customer vessels navigating the Mississippi River. Harry Boudreaux, the pilot of the M/V BAYOU LAFITTE, and Larry Paul Collins, a deckhand, were assigned to work with Kratzer that night. The normal crew of the BAYOU LAFITTE and the barge CHOTIN 1200 consisted of a pilot or captain, a tankerman and two deckhands. Thus, the normal complement was short since there was only one deckhand on duty. Collins was a "green hand," i. e., he had worked on the River for only a few days and had received virtually no training from his employer, Capital Marine. He was relatively unfamiliar with his duties as a deckhand and did not know how to perform them. At the trial he could not tell "port" from "starboard." On the boat the night of the accident, Kratzer had to assist Collins with many of his assigned duties.

3. Kratzer held a valid tankerman's license issued to him on October 28, 1976. He had worked on the River for about twenty-four months prior to the accident and he had been employed by Capital Marine since November 5, 1976. On December 24, 1976, Kratzer suffered a prior job-related accident in which he injured his back. At the time of the accident, he had just returned to work and was on "light duty."

4. The crew of the BAYOU LAFITTE and the barge, as instructed, had moved the barge upstream to a storage barge and had loaded diesel fuel and 55-gallon drums of oil onto the CHOTIN 1200 from the storage barge. Kratzer had to perform some of the duties of Collins during this operation.

5. After completing the loading operations, the pilot of the BAYOU LAFITTE let the CHOTIN 1200 drift downstream toward the Capital Marine boat store where the push boat and barge were to tie up. Kratzer and Collins, who remained aboard the CHOTIN 1200, used this time to prime a Blackmar pump located on the stern of the fuel barge. The pump was used to pump diesel fuel from the CHOTIN 1200 to customer vessels during midstream fueling. By priming the pump, less time would be needed when midstream refueling operations began later on. Kratzer, as he customarily had done in the past, on that barge, placed the overflow line of the pump into a bucket on the deck to catch any amount which dripped out, although he could have placed the bucket within a "drip pan" underneath the Blackmar pump.

6. Because it was fully loaded, the barge was low in the water and went aground prior to coming alongside the boat store. Kratzer explained to Collins how to watch the overflow hose and how to cut off the pump. He then went along the starboard side of the barge to the bow and managed to get a bow line loosely over to the boat store. Nevertheless, there remained a considerable distance between the stern of the barge and the boat store. Kratzer then returned to Collins and the pump and found that Collins had let diesel fuel run over the rim of the bucket and onto the deck. By the time he turned the pump off, a small area of the starboard deck was covered with diesel fuel.

7. Thereafter, Kratzer and Collins cut loose the face wires or "wing wires" attaching the BAYOU LAFITTE to the stern of the CHOTIN 1200 so that the vessel could move from the stern to the port side of the fuel flat. The BAYOU LAFITTE then began pushing the barge in an attempt to get it closer to the shore. When the captain of the BAYOU LAFITTE declared that he had pushed the barge as close to the boat store as possible, Kratzer made the stern line fast and tied it off. At that time there was still a gap of four to five feet between the barge and the boat store and Kratzer went toward the bow along the starboard side in order to take the slack out of the bow line. Near the cavil on the starboard bow, in an area which was not precisely located by Kratzer or any other witness, Kratzer fell to the deck. Collins was not exactly an "eye witness" to the event, as there were deck tanks and other obstructions on the deck that obscured his view.

Collins did, however, see Kratzer and heard him fall and went immediately to him.

8. Kratzer told Collins that he had fallen and complained of pain. Kratzer does not know what caused him to fall, and he could not describe the condition of the deck where he fell. Collins looked but did not observe any condition on the deck that might have caused the fall.

9. The accident occurred during the early morning hours of January 5, 1977, and the weather was misty and cold. During the time that the push boat was attempting to get the barge closer to the shore, Kratzer, in an attempt to get out of the elements, stood near the stern of the barge in the area of the Blackmar pump, and he apparently walked or stood in the previously spilled diesel fuel. Kratzer, of course, knew that Collins had let the pump run over and that there was diesel fuel on the deck.

10. The CHOTIN 1200 had walkways but no handrails. The walkways were neither raised nor specially grooved for traction, and the deck had been painted with non-skid paint. However, the paint had worn off in large areas due to the working operations on the barge, including the rolling of 55-gallon drums of oil up and down the deck. Several of the witnesses testified that the unpainted spots were slippery. The steel plates forming the deck of the CHOTIN 1200 were uneven in places due to repairs which had been made over the years, and there was mist or dew on the deck at the time of the accident.

11. There were lights upon the barge and Kratzer had a flashlight which he was using shortly before the accident.

12. A former deckhand, Willie Joe Anderson, testified that he had sustained two slip-and-fall accidents on the CHOTIN 1200 prior to Kratzer's accident. One of those accidents involved slipping on the wet deck of the barge in an area where the non-skid paint had worn off.

13. Kratzer could remember little, if anything, about what happened after he fell. His wife testified that her husband came home from work looking tired and dazed. Kratzer went directly to bed and slept until that evening when his wife took him to Doctor's Memorial Hospital in Baton Rouge.

14. The most probable cause of Kratzer's fall was some combination of diesel fuel on his shoes, the unevenness of the deck of the barge and his stepping onto a bare spot on the deck.

15. Kratzer was hospitalized at Doctor's Memorial Hospital from January 5, 1977, to January 18, 1977. During this time, he was examined and treated by Dr. Perry Chesney, Dr. Neal Smith, a neurosurgeon, and Dr. John Thomas, an orthopedic surgeon. Numerous tests were run and x-rays taken. Dr. Chesney's diagnosis was probable minor cerebral concussion and possible muscular strain about the right shoulder and thoracolumbar spinal areas. His prognosis was "good" with "no disability expected." (Kratzer No. 11) On January 10, 1977, Dr. Thomas reported the following impression: "I feel that Mr. Kratzer has suffered a cervical nerve root component as well as a lumbosacral sprain syndrome with possible nerve root irritation." (Kratzer No. 12) In a medical report dated September 20, 1977, Dr. Thomas' impression was: "I feel that Mr. Kratzer is probably suffering from mild chronic lumbar disc disease." (Kratzer No. 12) In a medical report dated January 13, 1977, Dr. Smith's impression was: "No central nervous system disease. This man has had what sounds to be a trivial head injury . . . ." (Kratzer No. 12)

16. On January 30, 1977, Kratzer was admitted to Our Lady of the Lake Hospital for inpatient treatment and further tests. During the course of his stay, Kratzer was treated by Dr. William Fisher, a neurosurgeon. Dr. Fisher's primary and final diagnosis was "[p]ossible herniated lumbar disc." Dr. Fisher reexamined Kratzer on November 14, 1977. Kratzer told Dr. Fisher that he still had pains in his lower right side. Dr. Fisher considered his examination to be "totally within normal limits for a neuromuscular standpoint." Dr. Fisher testified, by way of deposition: "I did not

consider him a surgical candidate at that time and I suggested that he continue to attempt to lose weight . . . ." (See Fisher's deposition at pp. 14–15.)

17. A Master's Certificate was issued to Kratzer on February 25, 1977, which entitled Kratzer to free medical treatment at the United States Public Health Service Hospital in New Orleans.

18. Dr. Douglas Davidson, a general practitioner and contract physician of the United States Public Health Service, treated Kratzer from February 1, 1977, until November 29, 1979. During that time, Kratzer continued to use a cane to assist him in walking and complained of lower back pain and pain in his right leg and buttocks. Dr. Davidson's final diagnosis was acute lumbar back strain, probable disc, with a minimum disability of 5 to 10 percent. Dr. Davidson testified that he considered Kratzer "unfit for duty" since February of 1977, when he first saw him, and that his condition would probably either remain stable or deteriorate. Dr. Davidson doubted that surgery would benefit Kratzer. Dr. Davidson further testified that there would be less strain on Kratzer's back if he lost some weight and that he is now fit only for light work.

19. Upon Dr. Davidson's request, Kratzer was admitted to the United States Public Health Service Hospital in New Orleans twice—first, on March 28, 1977, and later on August 10, 1977, for inpatient treatment and further diagnostic studies. According to a clinical report of Dr. Thomas Smith, a discogram was attempted unsuccessfully and discontinued after inability to enter the disc space. An EMG was performed on April 4, 1977, which Dr. Smith interpreted as showing that there was no significant motor dysfunction in the lower extremities; however, there was "some polyphasic motor units in the anterior tibialis and extensor hallucis longus, which could be secondary to irritation of the nerve root." Dr. Smith's diagnosis was "[p]robable herniated nucleus pulposus." The final diagnosis after Kratzer's visit in August of 1977 was "Chronic Lumbosacral Strain." (Kratzer No. 1) A myelogram was performed on August 15, 1977, but the results were "equivocal" according to Dr. Wilcox's clinical report.

20. Dr. John Watermeier, an orthopedic surgeon, first examined Kratzer on December 5, 1977. Dr. Watermeier diagnosed Kratzer as having long-standing chronic lumbar radiculopathy, associated with chronic lumbar strain, and possible evidence of L4–5 nerve root irritation. On March 6, 1978, Dr. Watermeier again saw Kratzer and arrangements were begun to admit Kratzer to the St. Charles General Hospital for an EMG, traction, a myelogram and an epidural venogram and possible surgery. (Kratzer No. 14, p. 10) When Kratzer went to St. Charles Hospital, the plans were aborted due to the defendant's refusal to guarantee payment since Kratzer had access to free medical treatment at the U. S. Public Health Service Hospital. Kratzer testified that he could not afford to have these tests and procedures done himself.

Dr. Watermeier's impression as of November 6, 1979, was that Kratzer had a lumbar disc which was causing him pain and that his condition would probably deteriorate (Kratzer No. 14, pp. 16–24) absent further diagnostic tests and surgery. Dr. Watermeier felt that Kratzer was able to perform light sedentary type employment at that time, however (p. 19).

Dr. Watermeier based his impression of lumbar disc disease upon Kratzer's complaints of back and leg pain, the limitation of his flexion of his back without pain, muscle spasms, the results of his straight leg raising test and decreased strength of Kratzer's big right toe (pp. 31–32 and 64). While Kratzer's military records show that he suffered a fractured great toe on his right foot and that he was unable to plant or flex this toe in May of 1973, Dr. Watermeier was not questioned as to whether this fact would change his opinion. (Capital No. 3, Kratzer No. 14)

21. The preemployment application that Kratzer completed with defendants on November 2, 1976, denies any "disabilities or handicaps." Plaintiff's military records show, however, that as of the time of his

discharge in May of 1973, plaintiff was claiming to suffer from various ailments, including mechanical low back pain and status post articular fracture of the right great toe with loss of active flexion of the toe.

22. At trial, Kratzer walked with a limp and used a cane. He appeared to be in pain whenever he had to sit or stand still for long periods of time. Mrs. Kratzer testified that her husband complains of pain on a daily basis and that his pain has gotten worse since the accident. She also testified that her husband no longer plays golf or plays physical games with the children.

23. Dr. Watermeier's bill for medical services rendered to Kratzer in the amount of $532 has not been paid by defendant.

24. Kratzer was employed by Capital Marine at a rate of pay of $40 per day.

25. During the trial, plaintiff waived penalties for late payment of maintenance.

26. Kratzer is presently attending college, using his veteran's benefits, and is engaged part-time in a minimum wage sedentary employment.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to its admiralty and general maritime jurisdiction, 28 U.S.C. § 1333, and the Jones Act, 46 U.S.C. § 688.

2. The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law." 46 U.S.C. § 688. Kratzer is a "seaman" under the Jones Act since he was assigned permanently to the vessel on which he was injured and he performed duties which contributed to the function of the vessel or to the accomplishment of its mission. *Offshore Company v. Robison*, 266 F.2d 769 (5th Cir. 1959); *Landry v. Amoco Production Co.*, 595 F.2d 1070 (5th Cir. 1979).

A Jones Act employer is negligent if he fails to provide the seaman with a reasonably safe place to work. Evidence of the "slightest negligence" is sufficient to sustain a finding of Jones Act liability. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314 (5th Cir. 1977). By comparison, the seaman's duty to protect himself is slight. His duty is to do the work assigned, not to find the safest method of work. *Spinks v. Chevron Oil Company*, 507 F.2d 216 (5th Cir. 1975).

Additionally, plaintiff's burden to prove causation in Jones Act cases is very light. Plaintiff need only establish that the defendant's negligence played some part, no matter how slight, in actually bringing about or causing the injury that he sustained. *Litherland v. Petolane Offshore Construction Services*, 546 F.2d 129 (5th Cir. 1977); *Landry v. Two R. Drilling Co.*, 511 F.2d 138 (5th Cir. 1975). Causation is not destroyed merely because plaintiff may have contributed to his own injury; contributory negligence may diminish plaintiff's recovery, but it does not automatically defeat it. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

3. The Court finds that defendant failed to use reasonable care to provide Kratzer with a safe place to work. Defendant knew or should have known that the CHOTIN 1200 was not a reasonably safe place to work. The uneven steel plates, the occasional grooves and indentations, and the patches of painted and unpainted areas combined to make the deck of the CHOTIN 1200 unsafe for normal working conditions. On a refueling barge such as the CHOTIN 1200, it was to be expected that diesel fuel and water would get on the deck during working operations and cause the deck to be even more dangerous than it already was. The defendant's failure to use ordinary care to remedy this situation constitutes negligence which was a contributing cause of plaintiff's injury.

4. Alternatively, the Court finds that Collins was negligent in failing to cut off the diesel fuel, as he was properly instructed by Kratzer how to do this and this was a simple procedure. I also find that Collins' failure to cut off the fuel played a

part in causing Kratzer's injuries. Furthermore, his negligence is imputed to defendant, as his employer, under the doctrine of respondeat superior. *Spinks v. Chevron Oil Co., supra.*

5. However, Kratzer's own negligence did contribute to his injuries. After the diesel fuel had been spilled on the deck, Kratzer did not attempt to clean it up or instruct Collins to do so. Instead of avoiding the area after the spill, Kratzer stood by the pump attempting to get out of the elements. In so doing, he either stood in or walked through the diesel fuel which he knew or should have known was on the deck. Kratzer certainly is charged with knowledge of the fact that the diesel fuel would tend to make his boots slippery, particularly on the deck of a barge which was in as poor condition as was the CHOTIN 1200. As stated above, my finding that Kratzer is contributorily negligent does not exempt defendant from liability. Under the doctrine of comparative negligence, Kratzer's damages will be reduced in proportion to his contributory negligence, which is hereby fixed at 25 percent. *McDonald v. Patton-Tully Transportation Co.*, 590 F.2d 126 (5th Cir. 1979).

6. The Court rejects defendant's argument that the sole cause of plaintiff's accident was his failure to clean up the spill. The facts indicate that Kratzer supervised and instructed Collins as to priming the pump as well as anyone could have under like circumstances. Kratzer's failure to clean up the spill, or to order Collins to do so, and his returning to stand in it are *contributing causes* of his injuries rather than the sole cause thereof.

7. As owner of the CHOTIN 1200, defendant had an absolute and nondelegable duty to furnish its crew a seaworthy vessel. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). A seaworthy vessel is one reasonably fit for its intended use. A shipowner is liable for all injuries and consequent damages proximately caused by an unseaworthy condition even though the owner may have had no notice or knowledge of the unseaworthy condition, *Litherland, supra.* A vessel is unseaworthy when its crew is inadequate or incompetent. *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 87 S.Ct. 1410, 28 L.Ed.2d 482 (1967); *Boudoin v. Lykes Bros. Steamship Co.*, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955); *Claborn v. Star Fish & Oyster Co., Inc.*, 578 F.2d 983 (5th Cir. 1978), cert. den. 440 U.S. 936, 99 S.Ct. 1281, 59 L.Ed.2d 494. Proof of contributory negligence in an action for unseaworthiness goes to mitigation of damages rather than liability. *Drachenberg v. Canal Barge Co., Inc.*, 571 F.2d 912 (5th Cir. 1978).

8. I find that the crew of the CHOTIN 1200 was both inadequate and incompetent and that this was a proximate cause of plaintiff's injuries. The incompetence of Collins was a substantial factor in causing Kratzer's injuries since Collins not only spilled the diesel fuel on the deck but also his incompetence caused Kratzer to run back and forth in order to take in the bow and stern lines. If either Collins or the missing deckhand had been performing these duties, the diesel fuel spill probably would not have happened, and Kratzer would not have been forced to take on the duties of the deckhands as well as his own duties as tankerman. Therefore, defendant is liable for the unseaworthiness of the CHOTIN 1200 which proximately caused plaintiff's injuries.

9. A seaman is entitled to maintenance and cure if he is injured or taken ill in the service of the vessel, without regard to the negligence of his employer or to the unseaworthiness of the ship. "Maintenance" is a per diem living allowance for food and lodging. "Cure" is payment for medical, therapeutic and hospital expenses. The employer's duty to pay maintenance and cure continues until the point when the seaman has reached "maximum cure."

"Maximum cure" is achieved when it appears that further treatment will result in no betterment of the seaman's condition. *Pelotto v. L & N Towing Co.*, 604 F.2d 396 (5th Cir. 1979). The seaman

bears the burden of proving that maximum cure has not been obtained; however, ambiguities are to be resolved in favor of the seaman. *Oswalt v. Williamson Towing Co., Inc.*, 488 F.2d 51 (5th Cir. 1974). Although there is conflicting medical evidence in this case, I find that Kratzer has proven that maximum cure has not yet been obtained. In particular, Dr. Watermeier's deposition indicates that Kratzer will improve with further tests and additional treatment, probably including surgery. On the other hand, Dr. Davidson testified that Kratzer's condition would either remain stable or deteriorate. Dr. Davidson, however, is a general practitioner, while Dr. Watermeier is an orthopedic surgeon.

10. As noted in the Findings of Fact, Kratzer had suffered a previous injury to his back while in the employ of Capital Marine and was on "light duty" at the time of the accident. In addition, plaintiff filled out a pre-employment application for Capital Marine which inquired as to handicaps or disabilities and Kratzer answered this question "no." The evidence shows that Kratzer sustained a back sprain while he was in the air force in 1972. The evidence is also clear that he had no trouble with his back after his discharge from the air force on August 20, 1973, until his December 1976 accident while working for Capital Marine. The evidence is also clear that he worked for two years on the River without back problems before entering the service of Capital Marine. Thus, defendants have not established that Kratzer failed to disclose material facts which were "plainly desired" or required by his potential employer. *McCorpen v. Central Gulf Steamship Corporation*, 396 F.2d 547 (5th Cir. 1968).

11. Kratzer seeks to recover $532 paid to Dr. Watermeier for private treatment and additionally desires future medical treatment of approximately $4,500, which would cover the cost of hospitalization, tests and surgery to be performed by Dr. Watermeier.

A Master's Certificate was issued to Kratzer which entitled him to free treatment at the U. S. Public Health Service Hospital. Ordinarily, the issuance of such a Master's Certificate discharges the employer's obligation for cure. *Oswalt v. Williamson Towing Co., Inc., supra.* Kratzer, however, has shown that the treatment tendered by the U. S. Public Health Service Hospital is inadequate. Dr. Davidson's testimony clearly indicates that Kratzer would not receive further beneficial cure at the U. S. Public Health Service Hospital. Yet, Kratzer has shown through Dr. Watermeier that private treatment may very well improve his condition. Under these circumstances, I find that Kratzer is entitled to utilize the services of the private physician Dr. Watermeier, and a private hospital, and that defendants will be liable for the costs of such treatment. *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

Kratzer has failed to show any basis for finding that Capital Marine willfully or callously refused to pay for cure, and during the trial, counsel waived any claim for penalties for late payment; accordingly, he is not entitled to recover attorney's fees.

12. Kratzer's back condition is painful and almost constantly so. He is incapable, at this time, of performing virtually any task involving physical exertion; for example, he cannot even pick up his children and hold them in his arms without incurring significant pain. He is entitled to an award to compensate him for present, past and future pain and suffering and this amount is fixed at $25,000.

13. Kratzer is also entitled to past and future loss of earnings. His rate of pay, at $40 per day, is $10,000 per year. As of the trial date, he had lost $30,000 in past wages.

Plaintiff anticipates that he will receive his college degree in 1982, and under these circumstances, he is entitled to future loss of wages for five years, a period which will allow him to complete his education and establish himself in a new position paying as much or more than he was earning on the river. His future lost wages for five

years at $10,000 per year will be discounted at 6 percent, making a present value of $42,123.63.

Plaintiff produced an economist who testified as to lost wages predicated upon an inflation factor and an increased productivity factor. There was no evidentiary justification for these factors, and the Court declines to accept them, and as noted, utilized a discount figure of 6 percent with no other factors in computing lost wages. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314 (5th Cir. 1977); *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5th Cir. 1975), cert. den., 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58; *Eason v. Weaver*, 484 F.2d 459 (5th Cir. 1973).

Kratzer is entitled to the following award:

| | |
|---|---|
| Three years' lost wages at $10,000 per year | $30,000.00 |
| Five years' future wages at $10,000 per year, discounted at 6 percent | 42,123.63 |
| Past and future pain and suffering | 25,000.00 |
| Total | $97,123.63 |

This amount must be reduced by 25 percent by reason of Kratzer's own negligence, or a total award of $72,842.72, together with legal interest thereon from January 5, 1977, until paid, to which must be added the unpaid medical bill of Dr. Watermeier in the amount of $532. He is also entitled to cure as indicated above and to maintenance at the current rate until he reaches maximum cure, subject to credit due for that already received.

Plaintiff's attorney is instructed to prepare a formal judgment in accordance with these findings and conclusions.