821 F.2d 559
 HERCAIRE INTERNATIONAL, INC., a Florida corporation,
Plaintiff-Appellee, Cross-Appellant,
v.
ARGENTINA, a foreign nation, Defendant-Appellant, Cross-Appellee.
HERCAIRE INTERNATIONAL, INC., a Florida corporation,
Plaintiff-Appellee,
v.
AEROLINEAS ARGENTINAS, Appellant,
Argentina, a foreign nation, Defendant.
 Nos. 86-5264, 86-5317.
 United States Court of Appeals,
Eleventh Circuit.
 July 14, 1987.
 
 1
 Dwight Sullivan, Steven M. Kamp, Hornsby & Whisenand, Alvin D. Lodish, Miami, Fla., for defendant-appellant.
 
 
 2
 Bruno A. Ristau, Kaplan, Russin & Vecchi, Joel E. Leising, Washington, D.C., for appellant.
 
 
 3
 Gregory G. Olsen, Morgan, Olsen & Olsen, Ft. Lauderdale, Fla., Ted R. Manry, III, MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiff-appellee.
 
 
 4
 Appeals from the United States District Court for the Southern District of Florida.
 
 
 5
 Before RONEY, Chief Judge, VANCE, Circuit Judge, and PITTMAN*, Senior District Judge.
 
 PITTMAN, Senior District Judge:
 
 6
 These consolidated appeals arise from a contract dispute between Hercaire International Inc., the plaintiff below, and the Republic of Argentina, a foreign state. In case No. 86-5264, we are asked to review the propriety of several rulings of the trial court which bear on Argentina's liability to Hercaire. In case No. 86-5317, we face the question of whether the property of Argentina's wholly-owned national airline, Aerolineas Argentinas, is subject to execution in satisfaction of the judgment against Argentina. For the reasons expressed below, we affirm the judgment in No. 86-5264 (liability) and reverse the judgment in No. 86-5317 (execution), and remand the case to the district court for further proceedings.
 
 Factual Background
 
 7
 In 1981, Hercaire International became a qualified supplier to the Air Attache of the Argentine Embassy in Washington, D.C. During late 1981, and early 1982, Hercaire successfully transacted thousands of dollars of business with Argentina.
 
 
 8
 In April, 1982, Argentina asserted control over the Falkland/Malvinas Islands. This brought an armed response from the United Kingdom, and a short war broke out. Argentina sought to increase the range of some of its aircraft in order to enable them to make the flight from their bases on the mainland to the fighting at sea and return without refueling. The political climate required that Argentina make these purchases in a clandestine manner.
 
 
 9
 Argentina engaged Hercaire to assist in procuring these tanks. The parties disagree as to Hercaire's role in this transaction. Argentina insists that Hercaire was to be the supplier. Hercaire contends that it was to be a mere conduit for Argentine funds. In any event, two facts are undisputed: Argentina deposited $1.25 million into Hercaire's bank account; and Argentina obtained no wing tanks from Hercaire.
 
 
 10
 After the conclusion of the war, several meetings between Hercaire and Argentina's representative resulted in a settlement between the parties. Hercaire issued a credit invoice to Argentina in the amount of $1.25 million as "credit against future purchases." The parties' differing contentions as to the scope and meaning of this settlement give rise to the present litigation.
 
 Procedural History
 
 11
 On June 9, 1983, Hercaire filed suit against Argentina for breach of contract, alleging that Argentina owed Hercaire $253,322.62, plus interest and costs, for Argentina's failure to pay for parts it bought from Hercaire. Argentina denied receiving the parts, and raised a counterclaim seeking $1.25 million for Hercaire's failure to supply the wing tanks to be used on Argentina's A-4 Skyhawk jets. Argentina later amended its counterclaim to allege that the wing tank dispute had been settled and that Hercaire was in breach of that settlement agreement by demanding a letter of credit in connection with the sale of an aircraft engine.
 
 
 12
 Argentina included the following language in its answer and counterclaim:
 
 
 13
 Defendant, The Argentine Republic, hereby waives its sovereign immunity and that of its agencies exclusively to that in the above-entitled matter. This waiver relating to this action shall not be considered as a precedent for any other matters in this or any other Court in the United States in which The Argentine Republic or any of its agencies are involved and any of which it may invoke sovereign immunity in accordance with International Law.
 
 
 14
 At trial, the district court directed a verdict in Hercaire's favor on a portion of its claim, represented by Plaintiff's Exhibit 1 (PX-1), and submitted the remaining issues to the jury. The jury, by special interrogatories, found that Argentina owed nothing on the remainder of Hercaire's claim, that the wing tank transaction had been settled by agreement, and that Hercaire had not breached that agreement. The trial court entered judgment on the directed verdict, and denied Argentina's new trial motion. Argentina appeals from the directed verdict on the PX-1 invoices, the final judgment, and the denial of its new trial motion. Hercaire cross-appeals the district court's denial of a directed verdict on a portion of its claim represented by Plaintiff's Exhibit 2 (PX-2).
 
 
 15
 In No. 86-5317, Aerolineas Argentinas (Aerolineas) appeals the orders of the district court which permitted Hercaire to seize a Boeing 727 owned by Aerolineas to satisfy the judgment against Argentina. On May 3, 1986, that aircraft was seized by U.S. Marshals as it landed at Miami International Airport. Aerolineas regained possession by posting a cash bond equal to twice the amount of the judgment. After a hearing, the court directed the Clerk to release $293,761.27 to the plaintiff in satisfaction of the judgment.
 
 The Directed Verdict on PX-1
 
 16
 The evidence before the court showed that the invoices included in PX-1 were for parts shipped to Argentina prior to June 30, 1982, the date of the credit memo. The credit memo clearly states that the credit is "against future purchases."
 
 
 17
 Argentina argues that a letter written two weeks after the credit was issued, Defendant's Exhibit-14 (DX-14), shows how the parties interpreted the agreement. The letter states that Argentina was applying the June 30 credit to all unpaid invoices. Argentina asserts that Hercaire's failure to object, protest or otherwise dispute the letter shows that the letter was a correct statement of the parties' agreement. Argentine argues that DX-14 created a jury question on its liability on the PX-1 invoices.
 
 
 18
 Hercaire argues that the DX-14 letter is irrelevant and could only be used to modify the settlement agreement. Modification was not raised as an issue, and Argentina expressly stated at trial that it was not contending modification. Further, even under Argentina's contention as to when a contract for purchase is formed, these transactions were clearly past purchases.
 
 
 19
 We find no error in the district court's direction of the verdict on PX-1. The undisputed evidence before the trial court shows that the settlement agreement provided for "credit against future purchases." The settlement date was June 30, 1982. All PX-1 invoices were issued prior to that date. The invoices were issued on the date that the parts were shipped. When the invoices were issued, the only thing remaining outstanding is payment. Argentina does not contend that it paid, only that it did not have to do so because of the credit memo.
 
 Denial of Directed Verdict on PX-2
 
 20
 Hercaire contends that it was entitled to a directed verdict on the invoices represented by PX-2. The evidence shows that these invoices represent parts ordered by Argentina prior to June 30, 1982, but which were shipped after that date. Again propriety of this ruling depends upon construction of the term "future purchases" used in the credit invoice.
 
 
 21
 Hercaire argues that under the parties' course of dealing, a contract and hence a "purchase" was formed when Argentina issued a purchase order that reflected the terms of its quotation. The quotation was an offer which Argentina could accept by issuing a purchase order.
 
 
 22
 Argentina concedes that sequence of events, but argues that the purchase order is the offer which could only be accepted by Hercaire's act of shipping the parts.
 
 
 23
 There is evidence to support both positions, and under these circumstances, it was not error to submit the issue to the jury for its resolution.
 
 Denial of the Motion for New Trial
 
 24
 Argentina argues that the jury's verdict on the counterclaim is against the great weight of the evidence, making the district court's ruling on its new trial motion an abuse of discretion. It also asserts that Hercaire's insistence on a letter of credit in connection with the sale of an aircraft engine was a breach of contract as a matter of law.
 
 
 25
 Hercaire contends that the settlement agreement did not obligate it to bid on, much less supply, any part that Argentina wanted. The settlement did not change the parties' relationship with each other, i.e., it did not create any new obligation to supply parts. The agreement and resultant credit merely provided an account against which future purchases would be applied. As a result, the letter of credit condition was not a breach of the settlement. On the contrary, it was the only means by which Hercaire could obtain the engine.
 
 
 26
 A timely motion for new trial is addressed to the sound judicial discretion of the trial court. E.g., Sulmeyer v. Coca Cola Co., 515 F.2d 835 (5th Cir.1975) cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976). A decision denying a new trial motion is reviewable only for an abuse of that discretion. Id. The law of this circuit holds that the trial court should grant a new trial only where the verdict is against the great weight of the evidence. Spurlin v. General Motors Corp., 528 F.2d 612 (5th Cir.1976). And normally, this court will reverse a decision denying a motion for new trial only where there is an absolute absence of evidence to support the verdict. Litherland v. Petrolane Offshore Construction Services, Inc., 546 F.2d 129 (5th Cir.1977).
 
 
 27
 This is especially true where, as here, the verdict-loser failed to test the sufficiency of the evidence in the trial court by means of motions for directed verdict and judgment n.o.v. "Under these circumstances, our inquiry is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency...." Coughlin v. Capitol Cement Co., 571 F.2d 290, 297 (5th Cir.1978) (emphasis in original).
 
 
 28
 Where, as here, conflicting evidence prevents the trial court from ruling, as a matter of law, on the existence or scope of an agreement, the issue is properly submitted to the jury for its resolution. The same conflict of evidence leads this court to find no abuse of discretion in the trial court's refusal to grant Argentina a new trial on its counterclaim.
 
 Execution
 
 29
 Aerolineas Argentinas (Aerolineas) appeals the trial court's rulings which allowed Hercaire to seize a Boeing 727, owned by the appellant Aerolineas, in aid of execution of the judgment rendered against the Republic of Argentina. The critical question for this court is whether the assets of a foreign state's wholly-owned national airline are subject to execution to satisfy a judgment obtained against the foreign state, where the airline was neither a party to the litigation nor was in any way connected with the underlying transaction giving rise to the suit. For the reasons expressed below, we answer this question in the negative.
 
 
 30
 Our analysis of this question begins with the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U.S.C. Secs. 1602-1611. The FSIA provides the exclusive basis for federal court jurisdiction in civil actions against foreign states, their agencies and instrumentalities, and the circumstances under which judgments rendered against foreign states can be executed. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491 n. 16, 103 S.Ct. 1962, 1970 n. 16, 76 L.Ed.2d 81 (1983); Jackson v. People's Republic of China, 794 F.2d 1490, 1493 (11th Cir.1986); 28 U.S.C. Sec. 1602. Under the framework established by Congress, the FSIA grants foreign states immunity from suit and from execution in U.S. courts, subject to certain specified exceptions. 28 U.S.C. Secs. 1604-07, 1609-11.
 
 
 31
 Among the specified circumstances under which a foreign state may be denied immunity from suit or execution is waiver. Thus, Section 1605(a)(1) provides that a foreign state may waive its immunity from suit "either explicitly or by implication." Section 1610 provides a similar exception with respect to immunity from execution:
 
 
 32
 (a) The property in the United States of a foreign state, as defined in Section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States ... if--
 
 
 33
 (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication....
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 (b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States ... if--
 
 
 37
 (1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly....
 
 Section 1603 provides:
 
 38
 For purposes of this chapter--
 
 
 39
 (a) A 'foreign state' ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
 
 
 40
 (b) An 'agency or instrumentality of a foreign state' means any entity--
 
 
 41
 (1) which is a separate legal person, corporate or otherwise, and
 
 
 42
 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
 
 
 43
 (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.
 
 
 44
 The dispute on this appeal is whether Argentina's express waiver of immunity for itself "and its agencies" operated to waive Aerolineas' immunity as well, and if not, whether the district court erred in ignoring Aerolineas' separate juridical existence.
 
 
 45
 The district court, in its Order Denying Release of Substitute Security, 642 F.Supp. 126, found that both Argentina and Aerolineas Argentinas implicitly waived immunity from execution under Sections 1610(a)(1) and 1610(b)(1). The district court also concluded that any presumption of separate juridical existence, see First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 627, 103 S.Ct. 2591, 2600, 77 L.Ed.2d 46 (1983), was overcome by the fact that Argentina owns 100% of Aerolineas' stock. The district court did not address the applicability of Section 1610(a)(2) (commercial activity upon which the claim arose).
 
 
 46
 Hercaire argues that under Section 1610(a)(1), a foreign state's commercial property is subject to attachment in aid of execution if the foreign state has waived its immunity. Since under Section 1603(a) the definition of foreign state includes its political subdivisions, its agencies or instrumentalities, a waiver by the sovereign state itself operates to waive immunity for all its political subdivisions, agencies or instrumentalities. Put another way, since the immunity for agencies, instrumentalities or political subdivisions is derived from the sovereign state, once the sovereign loses its immunity through waiver, all derivative immunity is also waived.
 
 
 47
 Resolution of the waiver issue depends on the propriety of the district court's ruling on Aerolineas' separate juridical existence. If Aerolineas lacks separate status, then the Boeing 727 seized by the Marshals certainly is Argentina's commercial property found in the United States.
 
 
 48
 Aerolineas asserts that it is an instrumentality of Argentina and as such enjoys a "presumption of independent status." Bancec, 462 U.S. at 627, 103 S.Ct. at 2600. That presumption may be overcome only upon a showing that there has been some abuse of the corporate form. See id. at 628-29, 103 S.Ct. at 2600-01; Letelier v. Republic of Chile, 748 F.2d 790, 794 (2d Cir.1984) cert. denied 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). Aerolineas argues that the district court committed clear legal error in determining that, based on Argentina's 100% ownership of Aerolineas' stock, its corporate existence is, in effect, a sham.
 
 
 49
 In Bancec the Supreme Court set forth the distinction between an instrumentality and an agency, noting that a government instrumentality typically
 
 
 50
 is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.
 
 
 51
 462 U.S. at 624, 103 S.Ct. at 2599 (footnote omitted).
 
 
 52
 These "distinctive features" of government instrumentalities, the Court declared, permit them "to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies." Id. at 624-25, 103 S.Ct. at 2599. The Court further observed that these same features of instrumentalities "frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large scale national investments." Id. at 625, 103 S.Ct. at 2599. Accordingly, "the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign in order to facilitate credit transactions with third parties." Id. at 625-26, 103 S.Ct. at 2599.
 
 
 53
 Hercaire's argument fails to account for the policy considerations underlying the recognition of Aerolineas' separate juridical existence. As the Bancec Court noted[g]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.
 
 
 54
 We find support for this conclusion in the legislative history of the FSIA. During its deliberations, Congress clearly expressed its intention that duly created instrumentalities of a foreign state are to be accorded a presumption of independent status. In its discussion of FSIA Sec. 1610(b), the provision dealing with the circumstances under which a judgment creditor may execute upon the assets of an instrumentality of a foreign government, the House Report states:
 
 
 55
 'Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality. There are compelling reasons for this. If US law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different US corporations or between a US corporation and its independent subsidiary. However, a court might find that property held by one agency is really the property of another.' HR Rep No. 94-1487, pp 29-30 (1976) (citation omitted).
 
 
 56
 462 U.S. at 626-28, 103 S.Ct. at 2600-01.
 
 
 57
 That discussion teaches two things. First, it states that Section 1610(b) is the provision governing execution of the assets of foreign instrumentalities. Second, it warns that the presumption of independent status is not to be lightly overcome.
 
 
 58
 The Bancec Court listed two possible means for ignoring an instrumentality's separate juridical status. That status may be overcome "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or upon equitable principles, where to recognize the corporate entity "would work fraud or injustice." Id. at 629, 103 S.Ct. at 2601. While that list is not meant to be exhaustive, we are offered "a conceptual framework for resolving" the issues at hand. Letelier, 748 F.2d at 793.
 
 
 59
 The district court was in error in holding that Argentina's 100% ownership of Aerolineas' stock was sufficient to overcome the presumption of separate juridical existence. In the present case there is no showing that Argentina exercises such extensive control over Aerolinas as to warrant a finding of principal and agent. Neither can we perceive any "fraud or injustice" which results from insulating Aerolineas' property from attachment in aid of execution of the judgment against Argentina. Having had no connection whatsoever with the underlying transaction which gives rise to Argentina's liability, it would be manifestly unfair to subject Aerolineas' assets to such attachment.
 
 
 60
 We recognize that this ruling makes Hercaire's task more difficult, but it must be remembered that the FSIA was not intended to eliminate sovereign immunity entirely, but merely to "remedy, in part," the "predicament of a plaintiff who has obtained a judgment against a foreign state." HR Rep. No. 94-1487, p. 8, reprinted in [1976] U.S.Code Cong. & Admin.News, 6604, 6606 (emphasis added). Prior to the FSIA, "a foreign state in our courts enjoy[ed] absolute immunity from execution, even in ordinary commercial litigation where commercial assets [were] available for satisfaction of a judgment." Id.
 
 
 61
 Accordingly, we VACATE the district court's Order Denying Release of Substitute Security, and REMAND for further proceedings in accordance with this opinion.
 
 
 
 *
 Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation