879 F.2d 170
 14 Fed.R.Serv.3d 1074
 HESTER INTERNATIONAL CORP., Plaintiff-Appellee,
v.
The FEDERAL REPUBLIC OF NIGERIA, et al., Defendants-Appellees,
v.
Jack M. KOONCE, Individually and d/b/a Koonce Engineering
Service, Movant-Appellant.
HESTER INTERNATIONAL CORP., Plaintiff-Appellant,
v.
The FEDERAL REPUBLIC OF NIGERIA, National Grains Production
Co., Limited, A Company Incorporated in Nigeria,
and the Government of Cross River State
of Nigeria, Defendants-Appellees.
 Nos. 88-4178, 88-4219.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 9, 1989.
 
 Allain F. Hardin, A. Remy Fransen, Wiedemann & Fransen, New Orleans, for Koonce.
 Thomas W. Prewitt, Richard C. Bradley, III, Prewitt & Bradley, Jackson, Miss., for Hester Intern. Corp.
 Walker W. Jones, III, E. Clifton Hodge, Jr., Phelps, Dunbar, Marks, Clavarie & Sims, for Federal Republic of Nigeria, et al.
 Appeals from the United States District Court for the Northern District of Mississippi.
 Before REAVLEY, WILLIAMS and JONES, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Hester International Corporation (HIC) appeals the district court's order granting the Federal Republic of Nigeria relief from a previous judgment and the court's subsequent dismissal of HIC's claim against Nigeria for lack of subject matter jurisdiction. Jack M. Koonce appeals the district court's denial of his motion for intervention in the case between HIC and Nigeria. We affirm the judgment of the district court.
 
 I. Facts and Prior Proceedings
 
 2
 HIC brought this breach of contract suit pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. Secs. 1602-1611, in state court in Mississippi against the Federal Republic of Nigeria (Nigeria), the National Grains Production Company, Limited, of Nigeria (NGPC), and the Government of the Cross River State of Nigeria (Cross River). NGPC is a corporation created under the Nigerian Companies Act of 1968 by the Government of Nigeria to support the development of agricultural projects in Nigeria. Cross River is one of the nineteen states which make up the Federal Republic of Nigeria. HIC is a Mississippi Corporation.
 
 
 3
 On April 9, 1981, HIC executed an agreement ("the Agreement") with Cross River and NGPC to establish a rice farming operation in Nigeria. The vehicle for this project was a limited liability company, Bansara Rice Farms, Ltd. Nigeria was not a party to the Agreement. NGPC and Cross River each owned 30% of the interest in Bansara and HIC owned 40%. The project failed, and HIC was removed as technical partner by the Board of Directors of Bansara in January, 1983.
 
 
 4
 HIC contends that the project foundered because of a lack of adequate capital to cover off-shore costs. Under the Agreement NGPC was to
 
 
 5
 procure the necessary finance for on-shore costs of the project in the size, sum, and style to be prescribed by the Board of Directors, provided always that the Government of the Federal Republic of Nigeria shall provide adequate security in the form of a guarantee for any such sum of money.
 
 
 6
 HIC "in association with Bajo Sosanya of Rice Exporters and Producers Limited (REP)" was designated the technical partner to the Agreement (Sosanya was later dismissed by HIC). The technical partners' duties included procuringexternal finance to cover the off-shore cost of the project (in the size, sum and style to prescribed by the Board of Directors) provided always that the Government of the Federal Republic of Nigeria shall provide an adequate security in the form of a guarantee for any such sum of money or cost of equipment made available by the Technical Partners.
 
 
 7
 John Hester, President of HIC, states that he arranged for a loan of $50,000,000 through a Swiss financier and merely needed a letter of intent from the Nigerian government in order to obtain the financing. He alleges that Nigeria breached its duty, however, by failing to provide him with such a letter, thus crippling his efforts to obtain external financing and leading to the dissolution of what was a viable project.[1] Although the Nigerian government was not a party to the Agreement, HIC claims that NGPC was an alter ego or agent of the Nigerian government and hence that Nigeria was bound by the provisions which stated that it would provide "an adequate security" for external financing.
 
 
 8
 The case was removed to federal court on diversity grounds. The defendants' attorney, Michael Shepherd, shortly thereafter moved to withdraw. Shepherd attended the pretrial conference held on February 12, 1986, and was allowed to withdraw after the conference. The defendants were sent notice of the exact date of the trial setting on March 25, 1986--a full week prior to trial. After receiving that notice, the defendants reemployed Shepherd. The bench trial was held on April 2, 1986. The district court rendered a judgment against defendants Nigeria, NGPC, and Cross River on June 4, 1986, awarding HIC the sum of $206,608,000.00.
 
 
 9
 The defendants then moved for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(1) and (6). That motion was granted on July 24, 1986, and a second trial was held in June of 1987. The court issued its decision in a memorandum opinion on February 22, 1988. The court dismissed the claim against Nigeria for lack of subject matter jurisdiction, dismissed the claim against Cross River and one claim against NGPC for failure to state a claim upon which relief could be granted, and decided HIC's other claim against NGPC on the merits in favor of NGPC. Hester International Corporation v. Federal Republic of Nigeria, 681 F.Supp. 371 (N.D.Miss.1988). The sole issues on appeal relate to HIC's claim of liability against Nigeria. HIC appeals the district court's decision to grant Nigeria relief from judgment which led to the second trial and also its decision to dismiss Nigeria for lack of subject matter jurisdiction. The decisions in favor of Cross River and NGPC are not appealed.
 
 
 10
 Koonce, an engineering consultant who worked with HIC on Bansara, claims he was assigned HIC's rights against the defendants by Hester. Asserting that those alleged rights were not adequately protected, he moved to intervene on February 12, 1988, (over six months after the second trial was held) and the district court denied his petition. He appeals the denial of his motion.
 
 
 11
 II. Nigeria's Motion for Relief From Judgment
 
 
 12
 We first address the procedural question of whether the district court was correct in granting Nigeria relief from the previous judgment. Within two weeks of the announcement of final judgment, Nigeria moved for relief from judgment pursuant to Rules 60(b)(1) and (6), Fed.R.Civ.P. The district court granted the motion, and a second trial on the merits subsequently took place.[2]
 
 
 13
 Motions under Rule 60(b) are directed to the sound discretion of the district court, and are reviewed only for an abuse of that discretion. Fackelman v. Bell, 564 F.2d 734, 736 (5th Cir.1977). The district court when considering the 60(b) motion recognized that the defendants were uncooperative throughout the entire first phase of this litigation but nevertheless granted relief.
 
 
 14
 In support of their motion for relief from the final judgment the defendants assert that they were not afforded adequate notice of the trial setting of April 2, 1986, inasmuch as they received notice of the trial date from the plaintiff on April 1, 1986. However, a full review of the relevant facts in this case reveals that from the date of the commencement of this litigation the defendants were uncooperative with regard to every aspect of the pretrial proceedings. It is also apparent that the defendants were, or should have been, immediately aware of the fact that their counsel of record, Michael Shepherd, had withdrawn several days after the date of the pretrial conference in this case and thus at that point had a heightened duty to follow the proceedings and otherwise act to protect their rights in this cause. Furthermore, the defendants had been warned several times that the trial was approaching and that plaintiffs would ask for an immediate trial setting, yet the defendants, apparently content with their pro se status, did nothing. Finally, and most importantly, the defendants were sent notice of the exact date of the trial setting on March 25, 1986--a full week prior to trial.
 
 
 15
 Despite the foregoing, the court finds that, upon application of the factors delineated in Seven Elves, which serve to guide a court's consideration of a motion under Rule 60(b), the defendant's motion for relief from judgment is well taken and should be granted.
 
 
 16
 Hester International Corp. v. Federal Republic of Nigeria, Et Al, No. WC85-49-NB-D, p. 2-3 (N.D.Miss. July 24, 1986) (memorandum opinion).
 
 
 17
 The district court's decision enumerates the defendants' failings but not the reasons for granting relief from judgment, beyond stating that it was applying the Seven Elves' standard. In an effort to demonstrate some of the factors which may have influenced the district court in granting the motion, Nigeria moved to make the transcript of the hearing on the motion for relief part of the record. That motion was carried with the case, and we now grant it.
 
 
 18
 Upon examination of the testimony, it becomes apparent that the defendants' difficulties in presenting their case at the first trial were not wholly due to obstreperousness, or perhaps an innate feeling of sovereign immunity. There were some differences between Nigeria and its lawyer, Shepherd, regarding payment, and after the pretrial hearing he was allowed to withdraw. This event was not necessarily the result of ill intentions on Nigeria's part. There were considerable administrative difficulties in getting approval for the attorney's payments and communication difficulties between the consulate and Nigeria proper.
 
 
 19
 Nigeria failed to pay attention to when the trial would actually occur. While notice of the trial setting was sent a week in advance, it arrived on Good Friday, a Nigerian holiday. It was, however, a valid notice. But the notice was not even seen by the Nigerian officials until one day before trial. Nigeria apparently was unaware that Shepherd had withdrawn until after receiving notice of the trial date. Although Shepherd had applied to withdraw several months earlier, the Nigerian officials believed he was using this as a bargaining tactic to make Nigeria speed up payment of his set fee. Upon receiving notice that the case was going to trial, however, Nigeria immediately reemployed Shepherd. He accepted the balance of his set fee from Nigeria and apparently told the consul that he would represent Nigeria at the trial. He then sent to the trial an associate from his firm who was unfamiliar with the case. That lawyer arrived after the noon recess, made a motion for continuance (which was denied), cross examined a witness and left before the end of the one day bench trial. Hence, although Nigeria was represented to some extent at the first trial, it presented no witnesses, no evidence, and no defense. The district court properly could have weighed these factors when deciding to grant relief from judgment to Nigeria.
 
 
 20
 In Seven Elves, Inc. v. Eskenazi, 635 F.2d 396, 402 (5th Cir. Unit A, Jan. 1981), citing United States v. Gould, 301 F.2d 353, 355-56 (5th Cir.1962), quoting 7 Moore's Federal Practice p 60.19, at 237-39, we delineated eight factors to be considered in ruling on a motion under Rule 60(b):
 
 
 21
 (1) That final judgment should not lightly be disturbed;
 
 
 22
 (2) that the Rule 60(b) motion is not to be used as a substitute for appeal;
 
 
 23
 (3) that the rule should be liberally construed in order to achieve substantial justice;
 
 
 24
 (4) whether the motion was made within a reasonable time;
 
 
 25
 (5) whether--if the judgment was a default or a dismissal in which there was no consideration of the merits--the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense;
 
 
 26
 (6) whether--if the judgment was rendered after a trial on the merits--the movant had a fair opportunity to present his claim or defense;
 
 
 27
 (7) whether there are intervening equities that would make it inequitable to grant relief; and
 
 
 28
 (8) any other factors relevant to the justice of the judgment under attack.
 
 
 29
 We went on to state that "[t]hese factors are to be considered in the light of the great desirability of preserving the principle of the finality of judgments." Id.
 
 
 30
 HIC claims that the district court misapplied the doctrine of Seven Elves. It is true that Seven Elves involved significantly different facts. There the defendants did not receive notice and were not informed by their attorney that the trial was to take place. No defendant or attorney for the defendants appeared at the trial. When they were ordered to show cause why a writ of execution should not issue, they immediately retained counsel and applied for relief from judgment. This Court overturned the denial of relief from judgment, finding that the trial court had abused its discretion.
 
 
 31
 HIC contends that in the case at issue the facts much more closely resemble those found in Crutcher v. Aetna Life Insurance Co., 746 F.2d 1076 (5th Cir.1984). Crutcher involved a summary judgment at a hearing attended by all counsel. This Court held in Crutcher that:
 
 
 32
 Rule 60(b) was not designed to operate as an insurance mechanism for clients. Its purpose is not to give relief to the client who does not choose the best lawyer for the job. Our cases liberally construing Rule 60(b) focus upon the abandonment of clients by their lawyers, not upon clients who lose. Thus, we have liberally construed Rule 60(b) when counsel's abandonment of a client causes a default judgment.... Crutcher's case is not a default judgment; it is a summary judgment at a hearing attended by all counsel. As a result, the policy of favoring final judgments looms larger in the scheme of factors the court considers on a 60(b) motion than it does when a default judgment is at stake.
 
 
 33
 Id. at 1083.
 
 
 34
 The factual circumstances of this case fall into a middle ground between those of Seven Elves and Crutcher. Here Nigeria was not misinformed or abandoned without warning. Nigeria initially lost in a trial on the merits, although under the particular circumstances it did not present any of the numerous defenses available to it. Furthermore, it was found uncooperative prior to that trial, and Nigeria bore a substantial measure of fault for the fact that it was disarmed during the first trial.[3] The language of Seven Elves nevertheless accurately describes the situation faced in the first trial; "regardless of the technical characterization of the judgment below, it seems clear that the full merits of the cause were not examined." Seven Elves, 635 F.2d at 403.
 
 
 35
 In the trial Nigeria did not merely fail to employ some of its potential defenses; no defenses were put forward at all. Certainly this was a "truncated proceeding" of the sort contemplated by Seven Elves. In such a truncated proceeding,
 
 
 36
 unless it appears that no injustice was done by the judgment, the equities in such cases will militate strongly in favor of relief. The absence of injustice is clear when the movant is unable to show the existence of a defense of sufficient merit to indicate the possibility that the outcome would differ upon retrial, [citations omitted] and that he had no fair opportunity to present that defense in the proceeding below.
 
 
 37
 Id. Nigeria was able to show defenses which might well, and indeed did, alter the outcome of the case upon retrial. Hence the second requirement for demonstrating an "absence of injustice" in the preceding judgment is not met in this case.
 
 
 38
 This motion reached other Seven Elves' factors; it clearly was not being used as a substitute for appeal and was made within a reasonable time period. Another consideration is that the initial judgment was for $206,608,000.00. We have recognized previously that if the amount of money involved is very great the amount militates in favor of granting a full trial on the merits. Seven Elves, 635 F.2d at 403.
 
 
 39
 Furthermore, the defendant is a foreign sovereign nation.
 
 
 40
 [I]t is in "the interest of United States' foreign policy to encourage foreign states to appear before our courts in cases brought under the FSIA. When a defendant foreign state has appeared and asserts legal defenses, albeit after a default judgment has been entered, it is important that those defenses be considered carefully and, if possible, that the dispute be resolved on the basis of all relevant legal arguments." [citations omitted].
 
 
 41
 Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1551-52 (D.C.Cir.1987). The involvement of a foreign sovereign is an unusual interest which must be taken into account.
 
 
 42
 Finally, one of the defenses raised was that of subject matter jurisdiction under the FSIA. It was appropriate for the district court to grant the new trial first and then examine fully the jurisdictional question. The court certainly had the authority to examine its own jurisdiction to conduct the initial trial.
 
 
 43
 As an incident of that examination it was free to inquire whether the judgment previously entered was to be vacated so that it could examine the jurisdictional issue free of any inferences that might flow from the existence of the judgment.... "The interests of justice require that these jurisdictional questions be determined in the context of adversarial proceedings."
 
 
 44
 Jackson v. People's Republic of China, 794 F.2d 1490, 1496 n. 3 (11th Cir.1986), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987).
 
 
 45
 We conclude that the policy favoring a judgment based on the full merits and a number of other factors as well justified the granting of a new trial pursuant to Fed.R.Civ.P. 60(b). The court did not abuse its discretion.
 
 
 46
 III. Jurisdiction Over the Federal Republic of Nigeria
 
 
 47
 Having determined that the motion to grant relief from the prior judgment was properly granted, the major issue we must address is whether the court erroneously dismissed HIC's action against Nigeria for lack of subject matter jurisdiction. HIC essentially makes the following four-part argument in maintaining that Nigeria breached the Agreement:
 
 
 48
 (1) NGPC was the alter ego or agent of Nigeria, and therefore when it signed the Agreement it also bound the Federal Government of Nigeria.
 
 
 49
 (2) Under the terms of the Agreement, Nigeria was to provide a guarantee for all loans necessary for off-shore financing.
 
 
 50
 (3) Nigeria refused to provide a letter of intent, a predicate to a full-blown guarantee, after HIC had made the arrangements for necessary off-shore financing. This refusal caused the collapse of a viable project.
 
 
 51
 (4) Nigeria's participation, through NGPC, in the Bansara Rice Farm project was a commercial activity. Such commercial activity confers subject matter jurisdiction under the FSIA. 28 U.S.C. Sec. 1605(a)(2)(1982). Nigeria therefore ceased to have sovereign immunity under the FSIA. Hence HIC can sue Nigeria for breach of contract as it would any other party to a commercial agreement.
 
 
 52
 Because it is undisputed that Nigeria was not a party to the Agreement, the necessary predicate for HIC to pursue its claim successfully is proof that NGPC was the alter ego or agent of Nigeria, capable of binding it to the Agreement. HIC argues that Nigeria is falsely attempting to hide behind NGPC, which is really part of the government of Nigeria, and is working a fraud on the court by doing so. The trial court below found that NGPC was not the agent of Nigeria, and hence the court did not have subject matter jurisdiction over Nigeria. Hester, 681 F.Supp. at 375-81. We uphold the district court's finding and do not reach the substantive merits of the steps in HIC's chain of argument.
 
 A. The Law Regarding Agency
 
 53
 HIC brings this action against Nigeria under the Foreign Sovereign Immunities Act (FSIA). That Act "[f]or the most part, ... codifies, as a matter of federal law, the restrictive theory of sovereign immunity." Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488, 103 S.Ct. 1962, 1968, 76 L.Ed.2d 81 (1983). The statute delineates certain exceptions to the general rule that a foreign state is immune from the jurisdiction of the courts of the United States. 28 U.S.C. Sec. 1604 (1982). Further, HIC claims that the district court had jurisdiction over Nigeria under the so-called "commercial exception." But we do not reach that issue.
 
 
 54
 HIC bears the burden of proving the agency relationship, which would allow NGPC to bind Nigeria to the Agreement. "[D]uly created instrumentalities of a foreign state are to be accorded a presumption of independent status." First National City Bank v. Banco Para El Comercio Exterior De Cuba, 462 U.S. 611, 627, 103 S.Ct. 2591, 2600, 77 L.Ed.2d 46 (1983) (hereafter, "Bancec ").[4] See also Hercaire International, Inc. v. Argentina, 821 F.2d 559, 565 (11th Cir.1987) ("the presumption of independent status is not to be lightly overcome."); De Letelier v. Republic of Chile, 748 F.2d 790, 795 (2nd Cir.1984), cert. denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985) ("Plaintiffs had the burden of proving that [the state instrumentality] was not entitled to separate recognition."); Baglab, Ltd. v. Johnson Matthey Bankers, Ltd., 665 F.Supp. 289, 294 (S.D.N.Y.1987).[5]
 
 
 55
 The leading case on determining whether a governmental entity is separate from the government itself is Bancec. In Bancec, the government of Cuba expropriated some of the property of First National City Bank (subsequently known as "Citibank"). Citibank asserted a set-off against the claim of the plaintiff Bancec based upon the Cuban government's seizure of Citibank's Cuban assets. The issue was whether the acts and liabilities of the foreign sovereign government of Cuba could be attributed to the state-owned banking entity, Bancec.
 
 
 56
 The Supreme Court held that Bancec was not an independent entity from the Cuban government, and thus that Citibank could set-off Bancec's letter of credit against the value of Citibank's property which had been expropriated by the Cuban government. An additional fact that weighed heavily in Citibank's favor was that Bancec had been dissolved and its capital had been split between a Cuban national bank and the foreign trade enterprises of the Ministry of Foreign Trade. The Supreme Court found, therefore, that had Bancec recovered the real beneficiary would have been the government of Cuba. There would have been an obvious inequity in allowing the government of Cuba "to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets...." Bancec, 462 U.S. at 632, 103 S.Ct. at 2603.
 
 
 57
 There are three significant aspects of the Bancec holding which are applicable to the case at issue. First, Bancec decided what the applicable law is in such a case. The Court employed both American law and international law (as part of American law) in characterizing the relationship between Bancec and the Cuban government.[6] It freely drew from American corporate law regarding the circumstances in which a corporation could be held not to be a separate entity from its owners, although the Court warned against overly mechanical use of the metaphor of "piercing the corporate veil." The Court specifically declined to apply the law of the chartering state to determine the separate juridical status of its instrumentality. 462 U.S. at 622-23, 103 S.Ct. at 2597-98. Hence HIC's claim that Nigerian law applies fails.
 
 
 58
 Second, the Court in Bancec outlined the features it attributed to an ordinary, separate, government instrumentality.
 
 
 59
 A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law. The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued. Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances. The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply. [footnote omitted].
 
 
 60
 These distinctive features permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies. [footnote omitted] These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments.
 
 
 61
 Id. at 624-25, 103 S.Ct. at 2599.
 
 
 62
 Finally, the Supreme Court recognized that it was not creating an exhaustive list of criteria for disregarding the corporate form of other sovereign states' instrumentalities.
 
 
 63
 Our decision today announces no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded. Instead, it is the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law. (footnote omitted).
 
 
 64
 Bancec, 462 U.S. at 633-34, 103 S.Ct. at 2603.[7]
 
 
 65
 Since Bancec, the issue of whether an instrumentality is genuinely separate from the government which owns it has arisen a number of times in federal court. A useful example is Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia, 616 F.Supp. 660, 666 (W.D.Mich.1985). There, the district court held that a government-owned corporation was no longer distinguishable as a separate entity when the majority of the instrumentality's stock had been expropriated, the government had required that all checks in excess of a certain amount be signed by a government-appointed director, a governmental agency was required to approve all invoices for shipments exceeding a certain amount, and the the government generally exercised direct control over its operation.
 
 
 66
 The core of the Kalamazoo case is that, as the district court found, the government had assumed day-to-day operation of the instrumentality which it owned. This basic principle has been employed (although subject to different verbal formulations) in other cases in which courts have found that the government-owned agency genuinely maintained its independent status. Hercaire, 821 F.2d at 565, held that 100% ownership alone was insufficient to overcome the presumption of separate juridical existence. Baglab, 665 F.Supp. at 297 (S.D.N.Y.1987), was a breach of contract suit regarding a loan. The court held that the plaintiffs failed to overcome the presumption of separate juridical status when they failed to prove that the Bank of England either made the specific loan decision at issue or exercised "general control over the day-to-day activities of JMB such that JMB might be considered its agent." In Gibbons v. Republic of Ireland, 532 F.Supp. 668, 672 (D.C.D.C.1982), the court held against the plaintiffs because they failed to show that government officials acted in concert with the employees of the instrumentality. The court said that "[w]hether latent powers were reserved by the sovereign is irrelevant inasmuch as undisputed affidavits ... establish that no representative of the ministries had any actual involvement with these matters."
 
 
 67
 We hold, therefore, as do these cases, that determination of whether a government instrumentality is a separate juridical entity involves the application of the law to fact-specific situations. See Gilson v. Republic of Ireland, 682 F.2d 1022, 1029 (D.C.Cir.1982) (case remanded for further findings of fact regarding the directness of the Republic's involvement with the operation of the corporations at issue). Therefore, having outlined the applicable law, we now apply that law to the facts of this case.
 
 B. Findings of Fact
 
 68
 The district court thoroughly delineated its findings of fact and also the documents and testimony upon which it based those findings. Hester, 681 F.Supp. at 378-81. We review these findings of fact under the clearly erroneous standard.[8]
 
 
 69
 In considering the question of whether NGPC was so extensively controlled by the Federal Republic of Nigeria that NGPC became its agent or alter ego, the following conclusions were among the findings of fact which the district court made:
 
 
 70
 (1) NGPC's government-owned stock was available for purchase by the public.
 
 
 71
 (2) NGPC's approximately 200 employees were not employees of Nigeria and not bound by the civil service rules and regulations.
 
 
 72
 (3) No employee or official of Nigeria was involved in negotiation of the Agreement. The Agreement was not approved by any employee or official of Nigeria prior to its execution.
 
 
 73
 (4) NGPC generated its own income from farms which it operated and from commercial and government loans. NGPC advanced $2,254,000 out of its operating budget for the purchase of equipment for Bansara through a letter of credit issued from its bank account in Nigeria. NGPC also advanced $184,000 out of its operating budget for the purchase of rice seed through a letter of credit issued from its bank account in Nigeria.
 
 
 74
 (5) Contrary to HIC's assertion that Cross River transferred the farmland to Bansara Rice Farms, Ltd. and was reimbursed for the value of the land through funds from Nigeria, the Bansara site was to be used by the Bansara joint venture partnership under the authority of a certificate of ownership held by NGPC. There is no freehold ownership of land in Nigeria.
 
 
 75
 HIC offered two documents to substantiate the claim that Nigeria purchased Bansara Rice Farms for NGPC: (A) a U.N. report which stated that "100% of the cost of land compensation ... should be paid by the federal government," and (B) a request by HIC for a letter of intent which was presented by the Federal Council of Ministers to the President-in-Council, which stated that "necessary land compensation payment has been made." Neither of these documents establishes that Nigeria purchased the Bansara Rice Farm land for NGPC.
 
 
 76
 (6) HIC claims that Nigeria, owning 100% of NGPC, therefore also owned 30% of Bansara Rice Farms through NGPC. HIC further claims that Nigeria had the right to vote directly its 30% interest in Bansara Rice Farms and exercised that right. The district court however found that Nigeria was not authorized to vote any shares in Bansara Rice Farms, Ltd. and there is no evidence that Nigeria exercised any voting rights or authorized any representative to act at any corporate meeting of Bansara Rice Farms.
 
 
 77
 (7) Documents generated during the dispute between NGPC and Cross River over control of the Bansara site after Hester's termination established that the Federal Ministry of Agriculture and Cross River, as well as NGPC, viewed NGPC as an entity entirely separate from Nigeria.
 
 
 78
 We have reviewed the testimony and documents in the record which the district court held support these findings of fact, as well as those which HIC claims contradict it. We find none of the court's conclusions to be clearly erroneous.
 
 HIC responds with the following arguments:
 
 79
 (1) NGPC had borrowing authority in the sum of 20 million naira (the Nigerian unit of currency) approved by Nigeria for external borrowing in 1982. This is correct.
 
 
 80
 (2) Nigeria owned 100% of NGPC's stock during the period in question and appointed its board of directors. This is correct.
 
 
 81
 (3) HIC claims that Nigeria participated in the day-to-day operations of NGPC. The district court reviewed a number of documents concerning the request for the letter of intent which HIC offered in support of this contention, and concluded that they did not demonstrate that Nigeria was involved in NGPC's day-to-day operation, but rather that at most the Federal Ministry of Agriculture exercised general supervisory control over of NGPC. The record shows that the district court's ruling is correct.
 
 
 82
 (4) HIC asserts that five additional documents which were not explicitly referred to by the district court in its findings of fact demonstrate Nigeria's control over NGPC's day-to-day operations. These documents consist of letters to and from the Federal Ministries of Agriculture and Finance in connection with HIC's attempt to garner a letter of intent from the Federal Government of Nigeria. None of them demonstrate anything other than that the Ministries of Agriculture and Finance received letters from HIC, NGPC, and Cross River urging them to help obtain a letter of intent from the Federal Government of Nigeria.
 
 
 83
 (5) HIC also introduced six additional documents which it claimed showed that NGPC represented Nigeria in promoting its agricultural policy. These included: (a) a brochure which NGPC submitted to HIC, (b) the Articles of Association of Bansara Rice Farms, Ltd., (c) a letter from NGPC to the Federal Ministry of Finance, (d) minutes from a Bansara board meeting, (e) a report prepared "for the government of Nigeria by the Food and Agriculture Organization of the United Nations," which stated that "the designated government counter agency was the National Grains Production Company, Limited which is a parastatal of the Federal Ministry of Agriculture," and (f) a U.S. Department of Commerce Oversees Business Report which stated that the Federal Government of Nigeria maintained operational authority over its parastatal corporations. Some of these documents do indeed contain statements that the NGPC "represents" the Federal Government of Nigeria in pursuing its agricultural policies. None of these documents were authored by the Federal Government of Nigeria. Furthermore, none except the United Nations document state anything more than that the NGPC represented the Federal Government of Nigeria. That general statement is facially not enough to establish an agency relationship. All corporations to some degree represent their owners.
 
 
 84
 (6) HIC further argues that the initial feasibility study, the project financial summary, and the synopsis of the feasibility study made it clear that Nigeria would guarantee all loans procured for external financing. Each of these documents was prepared by HIC; the Federal Government of Nigeria took no part in their preparation and did not issue them. Hester, however, makes the claim that there is a negative pregnant here because "at no time did anyone complain about those statements or disavow them!" Clearly these documents do not link Nigeria to the day-to-day operation of NGPC.[9](7) Finally, HIC submits that a secret memo from Cross River regarding Bansara portrays NGPC as "representing the Federal Government."
 
 
 85
 A careful review of all the documents which HIC argues demonstrate that NGPC enjoyed an alter ego relationship with the Federal Government of Nigeria, shows that the district court was correct in holding that HIC failed to establish that such a relationship existed. Although these documents demonstrate that the Federal Ministry of Agriculture may have had a general supervisory role over the NGPC, they do not demonstrate that the Federal Government was involved in the day-to-day management of NGPC with regard to the Bansara Rice Farm project. The sort of extensive control which was demonstrated in Kalamazoo and Bancec simply did not exist here. The two factors of 100% ownership and appointment of the Board of Directors cannot by themselves force a court to disregard the separateness of the juridical entities. NGPC in fact was demonstrated to possess most of the characteristics of what Bancec described as the "typical government instrumentality."
 
 
 86
 Analogizing to domestic agency law, it is worth noting that actual or apparent authority of an agent must be shown by "some manifestations, written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)." Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 493 (5th Cir.1974), overruled on other grounds, Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702-03, 102 S.Ct. 2099, 2104-05, 72 L.Ed.2d 492 (1982), as stated in Burstein v. State Bar of California, 693 F.2d 511, 518 n. 12 (5th Cir.1982). None of the documents prepared by Nigeria ever communicated that NGPC represented it beyond the extent that all corporate entities represent their shareholders. The documents that indicate a closer link between NGCP and Nigeria were all prepared by HIC, NGPC, or other parties, and Nigeria did not participate in their preparation nor did it in any way approve them.
 
 
 87
 We conclude the district court correctly held that NGPC was not the agent or alter ego of Nigeria, that Nigeria was not bound by the Agreement, and that the district court had no subject matter jurisdiction over Nigeria under the FSIA.
 
 IV. Koonce's Claim
 
 88
 Jack Koonce appealed the district court's order denying his petition to intervene in the suit between HIC and Nigeria. Koonce sought to intervene on February 12, 1988 over six months after the trial on the merits. The court denied his petition as untimely. Because there is now no cause of action between HIC and Nigeria, we dismiss this appeal as moot.
 
 Conclusion
 
 89
 We find the district court did not abuse its discretion in granting relief from judgment and that it was not clearly erroneous in its its subsequent finding that NGPC was not the alter ego of Nigeria. The judgment of the district court must be affirmed.
 
 
 90
 AFFIRMED.
 
 
 
 [1]
 HIC also alleged that both NGPC and Cross River, acting as alter egos or agents of Nigeria, breached the agreement by failing to obtain the requested letter of intent from Nigeria. HIC further alleged that NGPC breached its duty to provide additional interim on-shore financing in excess of $10 million. The district court dismissed the first set of claims against NGPC and Cross River and found on the merits for NGPC with regard to the on-shore financing claim. HIC did not pursue these claims on appeal, and hence we do not consider them here
 
 
 [2]
 Rule 60(b) provides, in part:
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... (4) the judgment is void; ... or (6) any other reason justifying relief from the operation of the judgment.
 Fed.R.Civ.P. 60(b).
 
 
 [3]
 The court recognized this and therefore required Nigeria to pay HIC $35,000 to offset the costs of the first proceeding when it granted relief from judgment
 
 
 [4]
 If we were determining whether the commercial exception applied, the reverse would be true; Nigeria would bear the burden of proving that its action was not commercial. Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.), 730 F.2d 195, 199 (5th Cir.1984) (party claiming FSIA immunity bears the burden of proving that exceptions do not apply)
 
 
 [5]
 The FSIA applies to "foreign states," a term which includes both the state itself and its political subdivisions and agencies or instrumentalities. To this end the FSIA provides that:
 (a) A "foreign state," except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
 (b) An "agency or instrumentality of a foreign state" means any entity--(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof,....
 28 U.S.C. Sec. 1603 (1982). NGPC is clearly an "agency or instrumentality" of Nigeria for purposes of the FSIA, because Nigeria owned 100% of NGPC's stock.
 The use of the single term "agency" for two purposes in the context of this case may cause some confusion. The FSIA uses it to determine whether an "agency" of the state may potentially qualify for foreign sovereign immunity itself under the FSIA. This is a completely different question from that which we must address here: whether or not the NGPC enjoyed an alter ego relationship with the Federal Republic of Nigeria so that it could bind Nigeria to a contract. Although such an alter ego relationship may be described in terms of "agency," it is a completely different inquiry than that which might be conducted under Sec. 1603. As shown infra, the level of state control required to establish an "alter ego" relationship is more extensive than that required to establish FSIA "agency." For instance, mere state majority ownership would not create an alter ego relationship.
 
 
 [6]
 "[T]he principles governing this case are common to both international law and federal common law, which in these circumstances is necessarily informed both by international law principles and by articulated congressional policies." Bancec, 462 U.S. at 623, 103 S.Ct. at 2598
 
 
 [7]
 The Court in Bancec also outlined an often-quoted nonexhaustive list of circumstances in which a corporation might be regarded as not legally separate from its owner
 [W]here a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created, we have held that one may be held liable for the actions of the other. [citation omitted] In addition, our cases have long recognized "the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." [citations omitted]. In particular, the Court has consistently refused to give effect to the corporate form where it is interposed to defeat legislative purposes.
 Id. at 629-30, 103 S.Ct. at 2601. While Bancec specifically states that it is outlining the rules with regard to piercing private corporate veils, this statement is often quoted as the Bancec standard for determining state and corporate alter ego status. See Hercaire, 821 F.2d at 565; Baglab, 665 F.Supp. at 294; Kalamazoo, 616 F.Supp. at 666.
 
 
 [8]
 In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses
 Fed.R.Civ.P. 52.
 
 
 [9]
 While we do not reach the merits of HIC's claim against Nigeria, it is useful to note that in the project financial summary HIC states that Nigeria would guarantee all external loans "up to the amount of participation by Nigerian entities in the project." A similar assertion is made in the synopsis feasibility study. This project ultimately foundered because Nigeria agreed to issue of letter of intent but only if it could guarantee 60 percent of any loan and HIC would guarantee the additional 40 percent. This HIC could not do. Yet it is apparent from these studies prepared by HIC itself that HIC understood the Agreement to entail only a 60 percent guarantee of any loan by the Federal Government of Nigeria