*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2000 FED App. 0391P (6th Cir.)
File Name: 00a0391p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

| | |
|---|---|
| COMCAST CABLEVISION-TAYLOR, <br><br>    *Petitioner/ Cross-Respondent,* <br><br> *v.* <br><br> NATIONAL LABOR RELATIONS BOARD, <br><br>    *Respondent/ Cross-Petitioner,* <br><br> COMMUNICATIONS WORKERS OF AMERICA LOCAL 4100, AFL-CIO, <br><br>    *Intervenor.* | Nos. 99-6185/6270 |

On Petition for Review and Cross-Application for
Enforcement of a Decision and Order
of the National Labor Relations Board.
Nos. 7-CA-42054; 7-RC-21365.

Argued: September 20, 2000

Decided and Filed: November 14, 2000

Before:  MERRITT and GILMAN, Circuit Judges; BELL,
                 District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:**    Theodore  R.  Opperwall,  KIENBAUM, OPPERWALL,  HARDY  &  PELTON,  Birmingham, Michigan, for Petitioner.  Deirdre Fitzpatrick, NATIONAL LABOR  RELATIONS  BOARD,  APPELLATE  COURT BRANCH, Washington, D.C., for Respondent.  Theodore E. Meckler, LAW OFFICES OF THEODORE E. MECKLER, Rocky River, Ohio, for Intervenor.  **ON BRIEF:**  Theodore R. Opperwall, KIENBAUM, OPPERWALL, HARDY & PELTON, Birmingham, Michigan, for Petitioner.  Deirdre Fitzpatrick, Frederick C. Havard, NATIONAL LABOR RELATIONS  BOARD,  APPELLATE  COURT  BRANCH, Washington, D.C., for Respondent.  Theodore E. Meckler, LAW  OFFICES  OF  THEODORE  E.  MECKLER,  Rocky River, Ohio, John G. Adam, Stuart M. Israel, MARTENS, ICE, GEARY, KLASS, LEGGHIO, ISRAEL & GORCHOW, Southfield, Michigan, for Intervenor.

_____

**OPINION**

_____

   RONALD  LEE  GILMAN,  Circuit  Judge.    Comcast Cablevision, Inc. seeks review of the National Labor Relations Board's Decision and Order directing Comcast to recognize Communications Workers of America Local 4100, AFL-CIO (the Union) as the employees' exclusive bargaining representative  at  its  Taylor,  Michigan  facility.   Comcast alleges that the Union unduly influenced the outcome of the

_____

   [*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

The hearing officer found that it was the Union's practice to host a party, win or lose, upon the conclusion of an election-organizing campaign. In addition, all Comcast employees were invited to the party regardless of their support for the Union. The fact that the Union optimistically called it a "victory party" does not in and of itself make the party objectionable. For these reasons, Comcast's allegations concerning the party are without merit.

### III. CONCLUSION

For all of the reasons set forth above, we grant Comcast's petition for review and deny the Board's cross-application for enforcement of its Order.

representation election by announcing during the campaign that it would provide free transportation and one night's lodging in Chicago over the weekend following the election for employees who wished to attend a two-hour meeting on cable-industry issues at 4:00 p.m. that Sunday afternoon. A second objection was filed concerning the Union's invitation for all employees to attend a "victory party" on the night of the election.

As a result of these two instances of alleged misconduct, Comcast argues that the election should be set aside. A Board hearing officer overruled Comcast's objections and certified the Union. A three-member panel of the Board affirmed the hearing officer's determination. The Board now cross-applies for enforcement of its Decision and Order. For the reasons set forth below, we grant Comcast's petition for review on the issue of the Union's trip offer and deny the Board's cross-application for enforcement of its Order.

### I. BACKGROUND

#### A. Factual background

Comcast is a corporation engaged in the transmission of cable-television programming in southern Michigan. On July 8, 1998, the Union filed an election petition with the Board, seeking to represent Comcast's 50 eligible employees in Taylor, Michigan. Approximately three weeks before the election, Shannon Kirkland, one of the Union's principal organizers, invited Comcast employees to come to Chicago for a weekend to attend a two-hour cable meeting during the annual convention of the Union's parent organization. The meeting was scheduled for late Sunday afternoon on the weekend following the election.

Kirkland told the prospective voters that the meeting would provide a good opportunity for them to "compare notes" about the cable industry. He also informed the employees that the Union would pay the transportation and hotel expenses of those who attended. When asked for a showing of interest,

there were "hands all over the place." The employees consistently described the offer as a free weekend trip to Chicago at the Union's expense. In the end, five employees traveled to Chicago, although at least two others had planned on attending and dropped out shortly before the weekend due to last-minute conflicts.

Although the meeting was not scheduled to take place until 4:00 p.m. on Sunday, the employees were driven to Chicago on Saturday morning. The employees thus had free time over the weekend for personal activities, and the record in fact shows that the five employees who went on the trip spent the extra time visiting family members, shopping, and sightseeing. The cost to the Union for the weekend trip worked out to approximately $50 per employee.

A secret-ballot election was conducted among the Comcast employees on August 27, 1998 to vote on whether the Union would become their collective-bargaining representative. Of the 48 votes cast by the 50 eligible employees, 31 were in favor of the Union and 17 against. The election was thus decided by a 7-vote swing.

## B. Procedural background

On September 3, 1998, Comcast filed objections to the election, alleging that the Union sought to unduly influence the outcome by its campaign tactics. The Board's Regional Director determined that two of Comcast's objections raised substantial and material issues that warranted an evidentiary hearing. These challenges were to (1) the Union's announcement three weeks before the election that it would pay for transportation and hotel accommodations for any employee interested in spending a weekend in Chicago to attend the union-sponsored conference, and (2) the Union's widely-publicized invitation a week before the election to a "victory party" on the evening of the election, the expenses of which would be paid by the Union.

## C. The Board did not err in determining that the Union's preelection offer of a "victory party" was acceptable conduct

Comcast also claims that the Union's preelection announcement of a "victory party" portrayed the Union as a major grantor of special benefits to the voting employees. It concedes that the party would not have been objectionable on a stand-alone basis, but when viewed in conjunction with the Chicago trip offer, Comcast claims that the party amounted to a special benefit intended solely to motivate employees to vote for the Union. The evidence in this case does not support Comcast's objection.

Absent any showing of impropriety in a union's promise to hold a post-election party, such an offer is not considered conduct that would reasonably interfere with an election. *See NLRB v. L&J Equipment Co.*, 745 F.2d 224 (3d Cir. 1984) (finding that a union's promise to host a post-election party was not objectionable conduct). In *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 810 (6th Cir. 1989), this court stated that "supplying food and soft drinks is commonplace in American elections and is not the equivalent of buying votes . . . [T]here is no evidence in the record that the food and soft drinks supplied in this case were so exorbitant as to amount to bribes." Such is the case here. The party took place at a neighborhood bowling alley adjacent to Comcast's facility. Pizza, salad, and beverages were provided for approximately 40 people at a total cost of $552.85.

Comcast relies on *Trencor, Inc. v. NLRB*, 110 F.3d 268 (5th Cir. 1997), to suggest that a preelection promise to hold a post-election party has the potential to influence votes. In *Trencor*, the court required the Board to hold a hearing concerning the union's pledge to host "the biggest party in the history of Texas," because such a promise "may have served as a possible inducement to get employees to vote for the Union." *Id*. at 270-71. No such grandiose pledges were made in the present case.

wagging the dog." At the time of the election, the Comcast employees were only aware of the Union's promise to pay for their transportation and one night's accommodations, without any specification of a monetary amount.

The Board goes on to posit that by attaching a caveat requiring employees to be responsible for their own expenses above and beyond transportation and lodging, the terms of the offer "put the employees on notice that the offer did not portend any excessive pecuniary benefits." But this begs the question of whether $50 per person is "excessive," a question that the Board has answered in the affirmative on prior occasions. *See Owens-Illinois*, 271 NLRB 1235 (1984) (holding that the distribution of $16 jackets constituted objectionable conduct); *Drilco, a Division of Smith Int'l, Inc.*, 242 NLRB 20, 21 (1979) (holding that the raffle of a trip to Hawaii or Disneyland was "so great as to divert the attention of employees away from the election and its purpose," even though its chance value per employee was approximately $5).

Finally, the Union and Board allege that the offer was legitimate because it was not contingent on the employees' support of the Union. This, too, is unconvincing. The Board noted in *Mailing Services* that even when such gratuities are offered upon the same terms to employees who make no pledge of support, they impose upon voters an implicit "constraint to vote for the donor Union." *Mailing Servs., Inc.*, 293 NLRB 565 (1989).

Providing transportation and one night's lodging so that the employees could have a free weekend in Chicago in conjunction with the two-hour union meeting was sufficiently valuable to influence the vote without relation to the merits of the election. *See Nestle Ice Cream*, 46 F.3d at 584. Accordingly, the Board erred when it certified the Union as the employees' exclusive bargaining representative.

On September 23, 1998, a Board hearing was conducted to look into these allegations. Subsequently, the hearing officer issued a report recommending that both of Comcast's objections be overruled. The Union's offer of the trip to Chicago was deemed not to have influenced the outcome of the election because the hearing officer found that (1) the employees would have been entitled to attend the cable industry meeting and be reimbursed for their expenses, (2) the offer was made available to all employees and was not contingent on the outcome of the election, (3) the offer to provide van transportation and one night's lodging could not be considered a substantial inducement, and (4) the payment by the Union for the employees' expenses was not excessive. Moreover, the officer determined that the announcement of the victory party did not interfere with the employees' ability to exercise their free and fair choice in the election because the party was not conditioned upon the outcome of the election and all employees were invited to attend.

After the hearing officer overruled Comcast's objections, Comcast filed exceptions to the officer's report. In its Decision and Order, the Board rejected Comcast's exceptions, adopted the hearing officer's findings, and certified the Union as the exclusive collective-bargaining representative of Comcast's employees. The Board specifically held that the weekend trip offer was of insubstantial value and would not tend to influence employees' votes.

In order to obtain judicial review, Comcast has refused to bargain with the Union. On May 19, 1999, the Union filed unfair labor practice charges protesting Comcast's refusal to bargain. Ultimately, the Board found that Comcast had violated 29 U.S.C. § 158(a)(1) and (5) of the National Labor Relations Act and ordered it to bargain with the Union. Comcast filed this petition for review of the Board's decision, and the Board cross-applied for enforcement of its bargaining order. The Union intervened in order to participate in the appeal. Resolution of both the election issues and the unfair

labor practice charge turns on the Union's conduct during the election.

## II.  ANALYSIS

### A.  Standard of review

Our analysis begins by noting that "Congress has vested the Board with considerable discretion in supervising and regulating representation elections." *NLRB v. Tennessee Packers, Inc.*, 379 F.2d 172, 180 (6th Cir. 1967).  In order "to assure employees the greatest freedom of choice in the selection of their representatives," the Board strives to conduct representation elections "in an atmosphere in which employees are free from pressure, coercion and undue influence from either the employer or the union." *Id.*  These "laboratory conditions" are necessary to gauge the free, uninhibited choice of the employees.   When a party's preelection conduct unduly influences the result of an election, "the Board has set aside such election and ordered a new one." *Id*.

A party seeking to overturn the results of a representation election bears "the burden of showing that the election was not conducted fairly." *NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1180 (6th Cir. 1988).  In order to satisfy its burden, the objecting party must demonstrate that "unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election." *NLRB v. Shrader's, Inc.*, 928 F.2d 194, 196 (6th Cir. 1991).

Because the "Board has broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union," *NLRB v. Duriron Co., Inc.*, 978 F.2d 254, 256-57 (6th Cir. 1992), the Board's findings with respect to whether an election reflected the "fair and free choice" of the employees "will not be disturbed on appeal where there is substantial evidence in the record as a whole to support its

As noted above, the Board grounded its decision on its finding "that the offered benefit is insubstantial and would not reasonably tend to influence employees' votes."  In support of its finding, the Board cited two of its prior decisions – *NuSkin International*, 307 NLRB 223 (1992) (upholding an election in which the union distributed $4 "Union Yes" T-shirts), and *Sony Corp. of America*, 313 NLRB 420 (1993) (upholding an election in which the union raffled off a television set with a "chance value" to each voter of $5.14).  The Board, however, has recently overruled *Sony* and adopted a ban on all election-day raffles.  *See Atlantic Limousine, Inc.*, 331 NLRB No. 134 (August 14, 2000).  In analyzing the raffle line of cases, the Board noted its failure to be "consistent when . . . focus[ing] on the value of the prize to determine whether a raffle is objectionable." *Id*. at *4.

Both the Board and the Union have belatedly asserted additional rationales in an attempt to portray the Chicago trip as a legitimate union activity.  This reasoning does not appear in either the hearing officer's Report and Recommendation or the Board's Decision and Order.  "We are not free to accept 'appellate counsel's post hoc rationalization for agency action' in lieu of reasons and findings enunciated by the Board." *Flav-o-Rich*, 531 F.2d 358, 362 (6th Cir. 1976) (citing *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 444 (1965)).  Therefore, we need not discuss these after-the-fact justifications.

The Board and the Union also assert that because the Union only reimbursed the employees for a modest amount of actual expenses, the offer was legitimate.  They contend that *NLRB v. Basic Wire Products, Inc.,* 516 F.2d 261 (6th Cir. 1975), should apply rather than *Nestle Ice Cream*.  This argument, however, is not persuasive.  In *Basic Wire*, the union's *post-election* payment of $20 to its election observer was found to be a "reasonable reimbursement for expenses" and therefore unobjectionable.  516 F.2d at 262.  Here, the facts call for a different conclusion.  A *preelection* offer of an expenses-paid weekend trip linked to a two-hour meeting smacks of "the tail

Offering to provide free transportation and lodging for a weekend in Chicago, even though linked to attendance at a *two-hour* meeting late on Sunday afternoon, constitutes just such an impermissible inducement. The situation might have been different if the employees had been invited to attend a *two-day* meeting substantially occupying the weekend, or if they had been transported back and forth on Sunday only. Where the Union crossed the line was in providing a free personal benefit all out of proportion to the two hours of legitimate educational activity.

Furthermore, there appears to be no foundation in the record for the hearing officer's determination that the "employees would have been entitled to attend the cable industry meeting and be reimbursed for the expenses incurred." The meeting brought together union leaders and delegates to discuss the potential effect on the cable industry of the merger between AT&T and Tele-Communications Inc., a subject bearing little relation to the employees' concerns about the terms and conditions of their employment at Comcast's Taylor, Michigan facility.

It is also no defense that the benefit granted could have been routinely extended to Union members. In *Mailing Services,* the Board equated a union's grant of free medical screening during the critical period with an employer-granted wage increase. The Board ordered a new election because the union had instilled in the employees a sense of obligation to the donor union and thereby tainted employee free choice. *See Mailing Servs.*, 293 NLRB at 566 n. 3. Although the union was free to promise employees that they would receive this benefit, the Board emphasized that the union was precluded from providing the medical screening to them shortly before the election. *See id*. at 565-66. Comcast asserts, with good reason, that if it had made a similar preelection offer of an expenses-paid weekend trip, both the Board and Union would perceive the offer as patently objectionable.

conclusions." *NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 285 (6th Cir. 1998) (citation omitted). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

On the other hand, this court is not a "mere rubber stamp" for the Board's decisions. *See Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284, 1292 (6th Cir. 1997). Although the court is limited to reviewing the Board's inferences for a determination of "reasonableness - not rightness," *NLRB v. St. Francis Healthcare Centre*, 212 F.3d 945, 957 (6th Cir. 2000), we "will not be bound by the Board's conclusions when the Board's determinations go beyond what good sense permits." *Local Union No. 948 v. NLRB*, 697 F.2d 113, 117 (6th Cir. 1982).

**B.   The Board erred in concluding that the Union's offer of a free weekend trip to Chicago did not improperly affect the election results**

The Board's principal duty in conducting a representation election is to "insure the fair and free choice of bargaining representatives by employees." *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 276 (1973). As both the Board and the courts have long recognized, this goal cannot be achieved when campaign tactics induce workers to cast their votes upon grounds other than the advantages and disadvantages of union representation.

The Supreme Court's decision in *Savair Manufacturing* provides the foundation for this circuit's case law regarding the effects of preelection benefits on a representation election. In *Savair Manufacturing*, the union offered to waive its initiation fees for employees who agreed to sign union recognition slips as a show of preelection support. *See id*. at 277. Although the union won the election, the Supreme Court held that the employer was not bound by the election results.

The use of the recognition slips was found to have interfered with the employees' free and fair choice. First, the Court reasoned that the union could point to the slips and create a false portrait of employee support for the union. *See id*. The Court refused to allow votes to be "bought and sold" in this manner. *Id*. In addition, the Court expressed its concern that employees would feel "obliged to carry through on their stated intention to support the union," even though the slips were signed for the fee waiver and were not legally binding in any way. *Id*. at 277-78.

When examining a preelection benefit conferred by a union, this circuit's case law counsels that the first question is whether the benefit is sufficiently valuable and desirable in the eyes of the person to whom it is offered to have the potential to influence that person's vote. *See Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578, 582 (6th Cir. 1995) (holding that the union conferred impermissible benefits on the employees when it filed a preelection lawsuit on their behalf against the employer). The second question becomes whether the benefit influenced the vote without relation to the merits of the election. *See id.* at 584. When a benefit imposes a sense of obligation to the union, it suffices to invalidate the election. *Id*.

Based on existing Board and circuit precedent, we conclude that there is a lack of substantial evidence to support the Board's finding that the Union's preelection offer of a free weekend trip to Chicago did not have the potential to influence the employees' votes. The Board therefore erred in certifying the Union as the employees' exclusive bargaining representative. In the Board's Decision and Certification, it dismisses the influence of the Chicago trip in a single footnote, which summarily states "that the offered benefit is insubstantial and would not tend to influence employees' votes." Although we will generally defer to the determinations of the Board and not substitute our own judgment in its place, "we do not function as a mere rubber stamp for the factual . . . determinations made below . . . and

we must acknowledge . . . any evidence which undermines the particular decision of the Board." *See Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284, 1292 (6th Cir. 1997) (internal quotation marks omitted).

Accordingly, this court has determined in the past, as has the Board, that union-conferred benefits far less "substantial" than the $50 average value involved here were sufficiently valuable to be found objectionable. *See NLRB v. Shrader's, Inc.*, 928 F.2d 194 (6th Cir. 1991) (invalidating an election where the union gave out hats and T-shirts throughout the voting periods); *Owens-Illinois, Inc.*, 271 NLRB 1235 (1984) (setting aside an election in which the union had distributed jackets worth $16 between voting sessions). If union hats, T-shirts, and jackets are considered sufficiently valuable to influence an employee's vote, then surely the offer of a free weekend trip to Chicago fits within this category.

Because the first part of the *Nestle Ice Cream Co.* test is satisfied, we now explore the second question of whether the benefit had the potential to influence the vote without relation to the merits of the election. *See Nestle Ice Cream Co.*, 46 F.3d at 584. The Board argues that attendance at the national cable-television meeting is just the sort of concerted activity that workers have the right to participate in, and that facilitating attendance at a gathering of union supporters and cable-television employees is certainly related to the merits of the election.

Although we would agree that union support for educational and informational activities is relevant to the question of whether the election would benefit the employees, the union may not give voters "free samples" of benefits before an election. *See Mailing Servs, Inc.*, 293 NLRB 565, 565-66 (1989) (setting aside an election where the union provided free medical screenings to employees before the election); *Wagner Electric Corp.*, 167 NLRB 532, 533 (1967) (overturning an election where the union made a preelection gift of life insurance to employees).